ON REMAND FROM THE UNITED STATES SUPREME COURT
Our previous opinion in this case has been reported at571 So.2d 1092. In that opinion we remitted a judgment of $3,012,400 to $1,000,000. The defendant insurer sought review by the United States Supreme Court. On March 4, 1991, while review of this case was pending in the United States Supreme Court, that Court held, in another case on review from this Court, that mechanisms providing for trial and appellate review of punitive damages awards in Alabama were sufficient to ensure that a judgment based on a jury's verdict of $1,040,000 in punitive damages against another insurance company defendant did not offend the substantive due process guarantee of United States Const. amend. XIV. Pacific Mut. Life Ins. Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Thereafter, that Court vacated the judgments in a number of cases, including this Court's prior judgment in this case,Intercontinental Life Ins. Co. v. Lindblom, ___ U.S. ___,111 S.Ct. 1575, 113 L.Ed.2d 641 (1991), vacating 571 So.2d 1092
(Ala. 1990), and remanded those causes for reconsideration in light of Haslip. See also Eichenseer v. Reserve Life Ins. Co.,881 F.2d 1355 (5th Cir. 1989), vacated, ___ U.S. ___,111 S.Ct. 1298, 113 L.Ed.2d 233 (1991), reinstated on remand,934 F.2d 1377 (5th Cir. 1991); Southern Life Health Ins. Co. v.Turner, 571 So.2d 1015 (Ala. 1990), vacated, ___ U.S. ___,
 *Page 888 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991), reinstated on remand,586 So.2d 854 (Ala. 1991). On remand, the parties, through briefs and oral argument, presented to this Court their respective positions in light of the United States Supreme Court's ruling in Haslip.
InterContinental Life Insurance Company ("InterContinental") contends that Haslip mandates a substantial further reduction of the jury's award against it in this case. It bases its reduction argument on two principal grounds. First, it contends that "in the ordinary case, with no special aggravating factors, Haslip makes clear that the presence of a ratio" of punitive damages to compensatory damages "far in excess of 4:1 signals that the punishment is likely to be excessive." Briefof Appellant InterContinental Life Insurance Company on Remandfrom the Supreme Court of the United States ("Appellant'sRemand Brief"), at 12-13. Second, it contends that "the reprehensibility of InterContinental's conduct was slight and does not support a large punishment." Id. at 29 (emphasis deleted).
InterContinental's first ground, that of proportionality, was fully addressed and ultimately rejected by this Court on the remand from the United States Supreme Court of Southern Life Health Ins. Co. v. Turner, supra. We will not revisit that argument here. However, in order to address properly InterContinental's reprehensibility argument, pursuant to the mandate of the United States Supreme Court, we must briefly revisit the arguments regarding the weight of the evidence of fraud and bad faith — the two counts on which the award of punitive damages must rest.
 I. Fraud
As our cases indicate, "a cause of action for deceit or willful fraud, for which punitive damages are recoverable, requires proof that the defendant knew his representation was untrue at the time he made that representation or that he made the representation with reckless disregard for the truth. Code 1975, § 6-5-103." Pacific Mut. Life Ins. Co. v. Haslip,553 So.2d 537, 540 (Ala. 1989). In the insurance context, the act of accepting premiums constitutes a representation by the insurer that the policy is in full force and effect. Such a representation, when made without the corresponding intent to pay the proceeds in the event of a claim and coupled with reliance by the insured, constitutes willful fraud. Id. at 542;Old Southern Life Ins. Co. v. Woodall, 348 So.2d 1377, 1380-81
(Ala. 1977).
In this case, Intercontinental accepted premium payments that were made by Mrs. Lindblom from January 1984 through August 1985, virtually all of which were made after the expiration of the 31-day grace period provided by the policy. InterContinental concedes that the evidence presented at trial "sufficed to permit the jury to find that InterContinental had failed" to notify Mrs. Lindblom as required by "accepted practices in the insurance industry" that she was tendering her payments outside the written grace period, or that the policy was in danger of lapse. Appellant's Remand Brief, at 4 n. 1.
At trial, InterContinental defended its conduct by reference to an unwritten "courtesy" period of an additional 14 days, which, it argued, allowed it to accept payments tendered outside the 31-day grace period. This extra-contractual period, InterContinental contends, represented merely a "voluntary, non-contractual benefit to its policyholders." Id. at 4 (emphasis added). The purpose of the courtesy period is, however, susceptible of a different interpretation.
Mrs. Lindblom contends that the unwritten courtesy period represented a scheme, which she says began in February 1984 with InterContinental's retroactive credit of the February 2, 1984, premium payment to the amount due in January, and by which she says InterContinental sought to maximize the benefit to itself and to minimize its liabilities to the insured, Ms. Tommie Rodenberry, or her beneficiaries. Under this interpretation, InterContinental could continue to accept the premiums without the concomitant contractual duty to pay benefits in the event of a claim. Indeed, Donna Faulkner, an employee of *Page 889 
InterContinental, conceded that InterContinental's practice of accepting premium payments tendered during the courtesy period "technically" allowed it to "take the money" and to reject at "anytime" a claim made under the policy. Her interpretation of the consequences of InterContinental's practice was reinforced by the testimony of InterContinental's senior vice president, James Grace. On cross-examination, Mrs. Lindblom's counsel asked: "Well, you told me in your deposition that technically, if [Tommie Rodenberry had] died at any time during the period [following January 1984 when the payments were being tendered] outside of the 31-day grace period, you didn't have to pay it?" To that question Mr. Grace responded: "Yes."
InterContinental continued to accept checks dated after the expiration of both the grace period and the courtesy periods until the death of the insured. More specifically, on September 15 and October 8, 1985, Mrs. Lindblom executed checks, which, she assumed, represented payment for September and October 1985, respectively.[1] Although InterContinental's computer "designated the policy 'terminated' " following receipt of the check dated September 15, 1985, Lindblom, supra, at 1095, InterContinental, without requiring a reinstatement of the policy, cashed the September check on September 23. It deposited the October check on October 21 — only two days before the death of the insured for which InterContinental denied contractual liability.
Also, the undisputed fact that InterContinental made no effort to determine whether Mrs. Lindblom had a viable claim under the policy further strengthens the inference that it accepted the premiums without the intent to pay the proceeds in the event of a claim. Indeed, InterContinental insists that its refusal to investigate the claim was immaterial because, it argues, it was not contractually compelled to pay the proceeds. Thus, it insists, an investigation of the facts leading to the claim would have yielded the same result.
InterContinental concedes that the "evidence would permit a finding of administrative shortcomings, inattention to established procedures, and . . . a lack of due regard for Lindblom's rights under the policy." Appellant's Remand Brief, at 29-30. It contends, however, that its conduct "falls far short of demonstrating any deliberate effort by InterContinental or its employees to cheat its policyholders generally or Lindblom in particular." Id. InterContinental contends, in other words, that its conduct did not "involve malice, oppression, or any other form of conscious wrongdoing."Id. at 30.
From the evidence presented, however, the jury was free to accept or reject InterContinental's construction of the evidence. The fact that another jury may have accepted InterContinental's version, which this jury rejected, is of no consequence to the issue before us, so long as the jury's verdict is in fact supported by the evidence. As we have stated previously, Intercontinental, 571 So.2d at 1099, and do now reaffirm, the record supports a determination that InterContinental's practice, which continued unabated until aclaim was made on the policy, of accepting premium payments after the expiration of the grace and courtesy periods constituted a willful misrepresentation that the policy remained in force.
Indeed, the jury may have reasonably interpreted InterContinental's intentions as to the policy in the following manner: (1) InterContinental consistently accepted premium payments after the expiration of the grace period; (2) in the event of a claim, InterContinental intended to treat the policy as lapsed; (3) in the event of litigation, InterContinental intended to justify its acceptance of the premium payments by alleging the existence of an additional unwritten "courtesy" period; (4) InterContinental reasoned that its acceptance of the premium payments before and after the expiration of the courtesy period might estop it from denying coverage in the event of a claim, believing, however, that its liability would extend only to the amount of *Page 890 
the policy; (5) in the event of litigation, InterContinental hoped to preclude verdicts of fraud or bad faith, with the consequent liability for punitive damages, by resorting to an argument based on the contractual grace period, that is, by contending that it had a contractual right to deny the benefits; and (6) InterContinental did not attempt to investigate Mrs. Lindblom's claim because, from February 1984, it knew that it was going to deny liability under the contract. An award of punitive damages was, therefore, proper under the misrepresentation count.
 II. Bad Faith
InterContinental attempts to distinguish this case from other cases involving claims of bad faith. More specifically, it insists that in this case it denied coverage before a claim was made, that is, following the tender of the premium payment dated September 15, 1985; whereas, in the usual case the insurer denies coverage only after the filing of a claim.
This argument, however, ignores the fact that by accepting both the September and October premium checks and, especially, by depositing the October check on October 21, InterContinental was treating the policy as effective two days before Tommie Rodenberry died. Moreover, Mrs. Lindblom produced the testimony of expert witness Edwin Trowbridge, whose testimony was based,inter alia, on his examination of approximately 47 of InterContinental's claim files. He expressed the opinion that the policy would have remained in force except for the death of Tommie Rodenberry in October 1985. Cross-examination of Mr. Trowbridge produced the following:
 "Q. You have no basis for saying that Mrs. Rodenberry's policy would still be in force and effect today if she had lived and were not critically ill in the fall of 1985?
 "A. I have a basis [for saying] that it would. The policy would still be in force. From my review of the payment history, the policy would be in force. It indicates that if that lady were alive today, they would still be paying premiums. The basis is the review of all of these dates and all of this indicates that they continually accept the premiums outside the grace period."
(Emphasis added.) Based on this evidence, the jury could reasonably have concluded that InterContinental did notactually regard the policy as lapsed until after the death of the insured. The situation involved in this case thus differs little, if any, from those ordinarily presented in claims alleging bad faith. The distinction urged by InterContinental is, therefore, without merit, and the jury could properly award punitive damages under the count alleging bad faith.
 III. Factors Considered on Review of Punitive Damages Award
In Haslip, the United States Supreme Court cited with approval a number of review factors applied by this Court in its original opinion to arrive at the judgment conditionally affirmed in this case. In addition to the "comparative verdict" analysis we employed, the factors included:
 "(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the 'financial position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation."
Haslip, ___ U.S. at ___, 111 S.Ct. at 1045. See also Green OilCo. v. Hornsby, 539 So.2d 218 (Ala. 1989). A number of these factors bear with particular force upon the facts presented in this case. *Page 891 
First, the unusually subtle nature of the practice employed by InterContinental rendered detection particularly difficult. Moreover, the trial court, in an order following the hearing required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), on InterContinental's post-trial motion alleging that the verdict was excessive, noted the "evasive and inconsistent testimony" presented by InterContinental's employees, including its senior vice president; that testimony indicated an ongoing attempt at "concealment" of facts relating to its wrongful conduct.
Second, regarding the "existence and frequency of similar past conduct," Mr. Grace testified as follows:
 "Q. Now, you have also told me before, and is it still your testimony today in this court, that it is . . . InterContinental's custom and practice, given circumstances such as those existing in this case — circumstances including the continuous acceptance of premiums without any pre-waiver or pre-lapse notice — that it's your company's custom and practice to handle this type of claim exactly this way?
 "A. Yes, it is our custom and practice to handle this claim this way.
"Q. All of them?
"A. That is correct."
(Emphasis added.) The evidence thus indicated widespread use of similar conduct and thus a high potential for harm similar to that suffered in this case. The frequency of this practice also increased InterContinental's potential for "profitability" from it. Finally, no criminal sanctions or civil penalties have been imposed upon InterContinental for its conduct in this instance as to require mitigation of the punitive damages award.
In view of these and other factors, we reject InterContinental's contention that the "reprehensibility of [its] conduct was [too] slight" to "support [such] a large punishment." Appellant's Remand Brief, at 29. Under our reading of Haslip, this Court's previous judgment against InterContinental in the amount of $1,000,000 bears a rational relationship to the legitimate goals of punishment and deterrence. Consequently, that judgment is hereby reinstated.[2]
JUDGMENT REINSTATED.
HORNSBY, CJ., and SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
MADDOX, J., concurs in the result.
[1] The September check was dated on the day that the courtesy period expired.
[2] From this holding it follows that Ms. Lindblom's motion to increase the amount of the supersedeas bond or to execute on InterContinental's assets is due to be, and is hereby, denied.