Northwestern Mutual Life Insurance Company ("Northwestern") appeals from a judgment based on a jury verdict awarding the plaintiffs, George and Judy Sheridan (husband and wife), $25,727,248.00 in an action alleging fraud, breach of contract, and wanton supervision. We affirm conditionally.
In September 1988, Jacob Behr, Northwestern's "district agent" in the area of Dothan, Alabama, sold to George and Judy Sheridan, sole shareholders of George Sheridan Automotive, Inc. (hereinafter Mr. and Mrs. Sheridan and their corporation shall be collectively referred to as "the Sheridans"), what Behr represented to be a "qualified retirement pension plan and a deferred compensation plan." Behr guaranteed a return on their investment in the amount of at least 10.25%. He stated that the plans were the only ones "on the market" and that they were available because Northwestern "was worth over $63 billion." It is undisputed that no such plan was available from Northwestern.
Second, he conditioned the establishment of the plans on (1) payment of $12,026.25, which was to be the first of annual contributions to the plan, (2) on Mr. Sheridan's purchase of a $200,000 life insurance policy from Northwestern, and (3) on the conversion to the plan of a Northwestern policy already owned by Mrs. Sheridan. Northwestern concedes that "[t]he representations made to the Plaintiffs by Behr were false," that "[t]here was no guarantee of 10.25% annual interest," that "the insurance applied for was not issued in the form requested," that "Behr remitted to Northwestern only approximately $3000 of the $12,026.25 payment of the Plaintiffs," and that Behr "apparently pocketed the balance."Brief of Appellant, at 14.
Throughout the following year, however, Behr periodically sent the Sheridans ledgers and related documents on Northwestern stationery falsely reporting the status of their investments. Moreover, on February 2, 1989, Behr, without the Sheridans' knowledge or permission, changed the address for receipt of information from Northwestern from the Sheridans' address to an address within Behr's control.
On August 2, 1989, Northwestern received an anonymous letter, stating in substantive part: *Page 387 
 "You should have evidence in your ISA department that one Jacob S. Behr, an agent of your company in Dothan, has had access to client accounts and has changed [the] address[es] of clients and made withdrawals from the accounts on several occasions and we believe this has been done without client knowledge. We would appreciate your checking into this matter as it will not only affect your present client funds, but it will affect your good name in our community.
"Sincerely,
"Concerned Citizen."
On September 29, 1989, at a regular monthly Northwestern sales meeting, Jack Wright, Behr's supervisor, discussed the letter with Behr. Behr admitted that he had commingled funds, but denied any other misconduct. Wright and Behr then agreed to meet on October 3, 1989, to discuss the matter further. The day before the meeting, Behr disappeared.
On October 4, 1989, Mrs. Sheridan, after her sister telephoned her to inform her that Behr had disappeared, visited Behr's office. Behr's secretary informed Mrs. Sheridan that no retirement plans existed and stated "that they were all crooks."
On December 4, 1989, the Sheridans sued Behr, alleging fraud, and sued Northwestern, alleging (1) breach of contract and (2) negligence or wantonness in its employment and supervision of Behr. The Sheridans sought compensation for economic and noneconomic loss and sought punitive damages. Following a nine-day trial, the jury returned the following verdict:
 "(1) We, the jury, find in favor of the Plaintiffs George and Judy Sheridan and Sheridan Automotive, Inc. against defendant(s):
 "[(a)] Jacob Behr [X] and assess $400,000 as compensatory damages and $12,463,624
as punitive damages.
 "[(b)] Northwestern Mutual Life Ins. Co. [X] and assess $400,000 as compensatory damages and $12,463,624 as punitive damages.
 "(2) We the jury find in favor of the plaintiffs George and Judy Sheridan and Sheridan Automotive, Inc. against the defendant Northwestern Mutual Life Insurance Company on their claim of negligence and/or wantonness and assess $400,000 as compensatory damages and $12,463,624 as punitive damages."
Based on this verdict, the trial judge entered a judgment against Northwestern in the amount of $25,727,248.00 [$24,927,248 ($12,463,624 x 2) in punitive damages + $800,000 ($400,000 x 2) in compensatory damages]. He subsequently denied Northwestern's motions for a remittitur or a new trial. Northwestern argues for reversal of the judgment on the grounds of (1) federal law preemption, (2) erroneous exclusion of evidence, (3) improper closing argument, (4) inconsistent or improper verdict, (5) insufficiency of the evidence, and (6) excessiveness of the verdict.
 I. Preemption
Northwestern contends that the Sheridans' state law claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. (1984). ERISA preempts or "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." Id. at § 1144(a) (emphasis added). We disagree with Northwestern's contention. "An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly ownedby the individual or by the individual and his or her spouse. . . ." 29 C.F.R. § 2510.3-3(c)(1) (1992) (emphasis added). Because George and Judy Sheridan were the sole shareholders of George Sheridan Automotive, they were not "employees" within the definition of that term in ERISA.
 II. Exclusion of Evidence
On November 29, 1989, Bruce Schwoch, an "audit coordinator" for Northwestern, sent the Sheridans a letter, reproduced here in substantive part:
 "Based on a review of the information available to us, we believe that the situation can be summarized as follows:
 "1. The proceeds from the $12,026.25 check that you wrote payable to Northwestern *Page 388 
Mutual Life on September 28, 1988, were retained by former NML agent, Jacob S. Behr.
 "2. Mr. Behr remitted a total of $3,483.98 to NML out of the proceeds that he retained to pay for the life insurance premiums on [Policy] 10824176, insuring Judy C. Sheridan and Policy 10901714, insuring George W. Sheridan. Neither policy was set up to be part of a qualified employee plan by Mr. Behr. In addition, the basic amount of insurance for policy 10901714 should have been $1,000 not the $30,000 actually issued. Both policies are $200,000 Adjustable CompLife policies.
 "3. Although Mr. Behr had a registration card and an adoption agreement for a Defined Benefit Pension Plan filled out, the registration card was never submitted to NML and the agreement was never formally executed. Therefore, at this time, you do not have a qualified deferred compensation retirement plan with NML. (Please see the attached copy of my letter stating the reasons why you could not qualify.)
 "Because we are unable to go back and retroactively set up the plan that you wish to have, we are proposing that the following steps be taken to resolve this matter. In addition, District Agent Bruce Miller and Special Agent Paul Johnson, in our district Agency office in Montgomery, will be working with you to set up a plan to handle your 1989 contribution.
 "[a]. We will refund the $12,026.25 that you gave to Mr. Behr on September 28, 1988. In addition, we will add interest at the rate of 10% on the $12,026.25 for the period from September 28, 1988 to December 15, 1989. This interest amounts to $1,485.25, which will result in a total amount due you of $13,511.50.
 "[b]. Policies 10824176 and 10901714 will be rescinded. New policies can then be issued based on your 1989 contributions to a new plan and your current insurance needs. As previously mentioned, premiums on these policies were paid for by Mr. Behr out of the funds that he had retained.
 "[c]. We agree to reimburse you for any fees and expenses that you may incur relating to the $12,026.25. The individual items that we would pay include any additional tax that may be due, any penalties and interest that may be charged to you by the IRS or state taxing authorities and any out-of-pocket expenses that you may incur in filing an amended tax return, such as for an accountant, tax advisor, or attorney.
 "[d]. We also agree to reimburse you for any out-of-pocket expenses that you may incur in setting up a qualified plan relating to your 1989 contributions. These expenses would include those for an accountant, tax advisor, or attorney.
 "If this proposal for resolving the situation meets with your approval, please inform us in writing. Upon receipt of your written approval, we will immediately send you our check for $13,511.50 and reimburse you for any expenses that you [may have] incurred to this time.
 "If you should have any questions or need any further information, please call me collect at (414) 223-2614. Please accept our apology for any inconvenience that this matter may have caused you."
Northwestern sought to admit the letter into evidence in order to demonstrate the lack of circumstances aggravating the Sheridans' injury, and, consequently, the absence of a basis for punitive damages. See generally, Ray Hughes Chevrolet, Inc.v. Gordon, 294 Ala. 638, 641, 320 So.2d 652, 654 (1975). The trial court admitted the letter, but only after excising the portions following the first paragraph of part three.
Northwestern contends that the result was prejudicial inasmuch as the admitted portions, it argues, tended to place it in a negative light. The Sheridans contend that the excised portions were inadmissible as representing a settlement offer. See Shoals Ford, Inc. v. McKinney, 605 So.2d 1197 (Ala. 1992);Super Valu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala. 1987). Northwestern denies that the letter represented an offer of settlement, contending, instead, that it merely contained a number of unconditional promises.
We disagree with Northwestern's characterization of the letter. On its face, the letter is conditional. Paragraphs [c] and [d] *Page 389 
begin: "We agree to reimburse you. . . ." (Emphasis added.) Even more significantly, paragraph [d] states: "If thisproposal for resolving the situation meets with your approval, please inform us in writing." (Emphasis added.) These statements are incompatible with the concept of a unilateral, unconditional promise. They are consistent, however, with anoffer of compromise or settlement. Thus, the trial court did not err in rejecting that portion of the letter.
 III. Closing Argument
Northwestern contends that the trial court erred in allowing the Sheridans' counsel to refer, improperly, it insists, to Northwestern's wealth during closing arguments. It cites a number of cases in support of the general rule against "reference in argument to an opponent's wealth." Allison v.Acton-Etheridge Coal Co., 289 Ala. 443, 447, 268 So.2d 725, 729
(1972).
This case is unusual, however, and distinguishable from the ones cited by Northwestern. In this case, Behr's guarantee of an investment return based on Northwestern's worth, which he alleged to exceed $63 billion, formed the essence of the inducement for the transactions that ultimately produced this action. Those statements were introduced during trial without Northwestern's objection. Thus, given these peculiar facts, we cannot conclude that the remarks of Sheridan's counsel warrant a reversal of the judgment.
 IV. Verdict Form
Northwestern objects to the verdict form submitted to the jury on a number of grounds. First, it argues that the form was inherently confusing. Specifically, it contends that the form required the jury to resolve in Part (1) the plaintiffs' claims for breach of contract, which, unlike the fraud claims that were also subsumed in Part (1), were applicable only to Northwestern and would not support an assessment of punitive damages.
However, the record reveals that Northwestern's attorneys helped prepare, and concurred in, the verdict form as finally submitted to the jury. Northwestern cannot, therefore, attack the verdict on the ground that the form confused the jury or resulted in an inconsistent or improper verdict as between the fraud and breach of contract claims. See Atkins v. Lee,603 So.2d 937 (Ala. 1992); E S Facilities, Inc. v. PrecisionChipper Corp., 565 So.2d 54 (Ala. 1990); Rainsville Bank v.Willingham, 485 So.2d 319 (Ala. 1986).
Second, Northwestern contends that the trial court misconstrued the jury's verdict, and, consequently, doubled what the jury had intended. In other words, Northwestern contends that the form actually evidences a verdict totalling only $12,863,624 ($12,463,624 in punitive damages + $400,000 in compensatory damages) against Behr and Northwestern jointly. It insists that it is impermissible to assess damages against a defendant based on vicarious liability and then to assess, again, damages based on that defendant's own misconduct. We disagree.
"In a given case the employer may be liable both on the ground that he was personally negligent and on the ground that the conduct was within the scope of employment." Restatement(Second) of Agency, § 213, comment h (1958) (emphasis added); accord Lane v. Central Bank of Alabama, N.A., 425 So.2d 1098
(Ala. 1983). It thus remains to be determined whether the evidence will support a verdict against Northwestern for wanton supervision of its agent.
 V. Sufficiency of the Evidence
Northwestern contends that it is shielded from vicarious liability by Ala. Code 1975, § 6-11-27. That section provides:
 "(a) A principal, employer or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee or servant of said principal, employer or master unless the principal, employer or master either: (i) knew or should have known of the unfitness of the agent, employee or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the *Page 390 
wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master, except where the plaintiff knowingly participated with the agent, servant or employee to commit fraud or wrongful conduct with full knowledge of the import of his act."
The Sheridans contend that Northwestern, among other things, " 'ratified' or 'authorized' the wrongful acts of Behr," and that it " 'knew or should have known of the unfitness' of Behr and 'used his services without proper instruction with a disregard of the rights or safety of others.' "
In this connection, it must be observed that § 6-11-27
modifies the common-law rule of vicarious liability by requiring proof of a higher degree of culpability on the part of the principal. Thus, as a logical matter, if plaintiffs can meet the statutory requirement for vicarious liability, they will, in many cases, also have established the elements of their claims for wantonness in the hiring and supervision of the agent. On the basis of testimony, some of which we set forth below, we are convinced that this is such a case.
L.J. Wright, Northwestern's "general agent in Alabama," testified that he interviewed Behr in 1981 for a position with Northwestern as a "special or soliciting agent" and at that time presented Behr with an application. On the application, Behr stated that he had not had a "business failure." Wright testified that while processing Behr's application, Northwestern learned that a company owned by Behr had, indeed, suffered insolvency and failure. Subsequently, on an insurance license application, Behr stated that he had no outstanding judgments against him. Wright testified that Northwestern did not investigate the accuracy of that statement, and, moreover, that he was unaware of any "personal" financial difficulties. Northwestern subsequently approved Behr's applications, and he began employment under Wright's supervision as a special agent.
Lawanda Lawler, a Houston County circuit court clerk, presented documents in response to a subpoena requesting "case action summaries and copies of complaints on all lawsuits filed by, or against, Jacob S. Behr since January 1, 1979." She testified that, notwithstanding Behr's denials of legal or financial difficulties, he or his corporation had been sued 16 times between January 1, 1979, and June 15, 1981. At least seven of the lawsuits contained claims alleging fraud. Moreover, Houston County records contained evidence of 13 judgments and 6 tax liens against Behr individually and 171 judgments against Behr or his corporation.
Evidence at trial also revealed that several actions were filed against Behr after Northwestern employed him. In 1983, for example, Behr was sued by two Dothan businesses to collect delinquent accounts. At least one action, notice of which Northwestern admitted, resulted in the garnishment of Behr's bank account.
Of particular significance was an action filed in a United States district court against Behr in 1984 by Auto Brokers of Alabama in connection with a used automobile that Behr had traded to Auto Brokers. The action alleged fraud and violations of the Motor Vehicle Information and Cost Savings Act,15 U.S.C. § 1981 (1982). In holding against Behr for $13,439.57, the trial judge stated:
 "Auto Brokers has two claims against Behr. One is based on the Motor Vehicle Information and Cost Savings Act, United States Code, Title 15, Section 1981, and the other is based on simple state fraud. Auto Brokers is entitled to recover under both claims.
 "Behr misrepresented to the operators of Auto Brokers that the mileage on the Cadillac was 64,650 miles. This was an existing material misrepresentation. Behr knew at the time that the mileage on the Cadillac was approximately 164,650 miles. Behr made the misrepresentation knowingly, wilfully and intentionally and with specific intent to induce Auto Brokers to rely thereon."
Auto Brokers of Alabama v. Williams Lincoln-Mercury, Inc., andJacob S. Behr, No. 84-T-1325-S, March 7, 1985 (M.D.Ala.). Also, in 1985, three actions were filed against Behr in the Houston County Circuit Court, *Page 391 
alleging insurance fraud. Northwestern conceded notice of the federal court judgment and of the actions arising out of Behr's insurance transactions.
In addition to lawsuits and other complaints filed against Behr, other agents of Northwestern testified of misconduct they had personally observed. For example, Greg Hendrix, who currently serves the Dothan area as Northwestern's district agent, testified that on a number of occasions he had seen Behr forge signatures on applications "with the use of a fluorescent light." This evidence was corroborated by Donald Parker and Greg Herman, who also testified that they had seen Behr forge customers' signatures. Parker testified, moreover, that Behr occasionally cashed commission checks written to other Northwestern agents by forging their indorsements.
Significant in this connection was evidence, such as the following testimony of Greg Herman, regarding Behr's reputation in the community, and, more pertinently, among his fellow Northwestern agents:
 "Q. [By the plaintiffs' counsel] Did you and Greg get together — Greg Hendrix — get together and discuss the problems you all were having with Jake Behr?
"A. [By Greg Herman] We did.
"Q. Did you do this on more than one occasion?
"A. Several occasions.
"Q. Was this in 1985?
"A. It was.
 "Q. What did you all discuss as being the problem with Jake Behr?
 "A. Well, we discussed the forgeries that we both knew took place, his business activity, his reputation in town as a hustler, as a crook, and the fact that there were a lot of people in Dothan that wouldn't do business with Greg and me if we were associated with Jake Behr. The clients would tell us that — they told us that [if] we were associated with Jake Behr, they refused to do business with us, because they considered him to be a crook, and they didn't want to be involved with him. We were both a little concerned about the forgeries and that kind of stuff that Jake was doing, and we wanted to work for the company, but we just wanted to work out of a separate office; and we discussed this several times, and because — it wasn't an overnight decision to call Jack Wright to ask if we could disassociate ourselves. That was a pretty major undertaking; and we discussed it, and Greg — we either . . . decided that Greg would call or Greg volunteered to call. But he made the phone call.
". . . .
 "Q. What else did you all talk about, if anything, that you and Greg, about what you needed to tell Jack Wright as to the reasons that you all needed to leave there?
 "A. Well, other than clients would not do business with us if we were associated with Jake, we discussed Jake's activities that we did not agree with, and we just thought it would be best if we disassociated ourselves with him.
". . . .
 "Q. Did you know [Behr's] reputation for truth and honesty in the Dothan community in 1985?
 "A. [Behr's] reputation was that he was a hustler and a crook.
 "Q. What did you know [about Behr's] reputation in 1985 among the agents in the Dothan office that worked with you all?
 "A. Well, the agents that I worked with also thought he was a hustler — that he did whatever it took to get somebody to buy an insurance policy. No holds barred, so to speak.
 "Q. Do you know what his reputation for truth and honesty was among insurance agents generally in the Dothan area?
". . . .
 "A. The other insurance agents that I talked with hated [Behr], you know. They didn't like him at all. He didn't — I had several complaints from other insurance agents that [Behr] had gone in and misrepresented the insurance that they sold and *Page 392 
he talked them into canceling and buying with him, that kind of thing."
(Emphasis added.)
Particularly significant was testimony, of which the following excerpts are but examples, regarding the results of complaints to Behr's supervisors by fellow agents:
 "Q. [By the plaintiffs' counsel] All right. Did you all seek to leave Jake Behr's office?
 "A. [By Greg Herman] Yeah. We asked Jack [Wright] if we could still work for Northwestern Mutual, but work in a separate office, other than in the office with Jake Behr.
"Q. Were you allowed to do that?
"A. No. We were not.
"Q. What were you told?
 "A. Greg Hendrix told me in a meeting after his phone call that Jack Wright . . . would not allow me and him to leave the office, we would have to work in the office with Jake Behr if we were going to work for Northwestern Mutual.
". . . .
 "Q. And did Greg Hendrix further tell you that he told [Jack Wright] about the forgeries?
"A. He did.
". . . .
 "Q. And you told all this same information to Northwestern Mutual Life Insurance in a telephone conversation of November of 1986, didn't you?
". . . .
"A. I did.
 "Q. About when was it that you and Greg decided to contact Jack Wright? "A. It would have probably been towards the end of the summer of [1985]."
Moreover, Bruce Schwoch, an "audit coordinator" for Northwestern, testified that, as early as 1987, Northwestern had documentary evidence of instances in which Behr had, as in this case, changed the addresses of policy owners to an address controlled by Behr, thus isolating the owners from direct contact with Northwestern. Schwoch testified that such a practice allowed Behr to withdraw funds from a policyholder's account without the owner's authorization, and to prevent the owner from discovering the true status of his policy. Behr's "maildrop" practice had also been discovered by agent Greg Hendrix at least a year before the commencement of this action.
The Sheridans also produced evidence that, concurrently with these and other complaints, Behr's career with Northwestern advanced steadily. For example, Northwestern honored Behr in 1982 with a "New Agent Bronze Award" and a "Ruby Award," and in 1984 with a "Golden Award." Also, Behr enjoyed membership from 1982 to 1986 in Northwestern's "Seventy-five Lives Club," and from 1983 to 1986 in the "Hundred Lives Club." Behr's sales volume, which provided the basis for these awards, reached a career total of $67,300,000.[1] Additionally, he was promoted in 1982 from "special agent" to "field director" for Houston and Dale Counties. In 1986, his territory was further expanded to include Coffee, Geneva, and Henry Counties.
On the basis of this and similar evidence, the jury could also have concluded that Northwestern knew of Behr's unethical conduct and not only tolerated, but actually exploited, that behavior. It could have concluded that Northwestern only reluctantly broached the subject with Behr when inescapably confronted with the growing evidence of Behr's misconduct. The jury could, moreover, have concluded that Northwestern rebuffed the efforts of its agents timely to rectify the problem by notifying Behr's superiors, because of Behr's large sales volume. Consequently, it could have concluded that Northwestern consciously factored in the possibility of adverse judgments against it and Behr as an acceptable business expense. That another jury might have reached different conclusions "is of no consequence to the issue before us, so long as the jury's verdict is in fact supported by the evidence,"Intercontinental Life Insurance Co. v. Lindblom, 598 So.2d 886,889 (Ala.), cert. denied, ___ U.S. ___, 113 S.Ct. 200,121 L.Ed.2d 142 *Page 393 
(1992), as it clearly and convincingly is in this case.
We are thus compelled to conclude that the verdict does not represent a double recovery, as Northwestern contends. Instead, the jury found Northwestern liable under a theory of vicarious liability for the $12,863,624.00 in Part (1)(a) and (b) of the verdict form, and also liable under a theory of wanton supervision for the $12,863,624.00 in Part (2) of the verdict form.
Jury "verdicts are presumed correct and the presumption in favor of the correctness of the verdict is strengthened when a new trial is denied by the court." Grandquest v. Williams,273 Ala. 140, 145, 135 So.2d 391, 394 (1961). Moreover, "in cases involving damages that are incapable of precise calculation, a jury's damages assessment may be disturbed only when it is so flawed by bias, passion, prejudice, corruption, or improper motive as to lose its constitutional protection." Moore v.Mobile Infirmary Ass'n, 592 So.2d 156, 161 (Ala. 1991). This latter rule is, of course, particularly applicable to the noneconomic and punitive damages claimed in this case, and it was the subject of a two-day hearing following the trial of this case.
 VI. Excessiveness of the Verdict
On March 27-28, 1992, the trial court conducted hearings pursuant to Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), to review the amount of the verdict. On April 13, 1992, the trial court denied Northwestern's motions for a JNOV, a new trial, or a remittitur of the damages award. The trial court's order states in part:
 "Ample evidence was presented at trial which supports the total compensatory damages award of $800,000.00 against Northwestern Mutual. The issue to be determined is whether the punitive damages award of $24,927,248.00 is appropriate and justified by the evidence. Having considered the evidence presented at the trial of this case and at the hearings conducted by this court, this court finds that the award of punitive damages . . . is not excessive and is appropriate for the reasons that follow.
 "Plaintiffs proved that Northwestern Mutual's District Agent, Jacob Behr, misrepresented to them that, in exchange for their initial contribution of $12,026.25, he would enroll them in a qualified retirement pension plan with Northwestern Mutual. In fact, plaintiffs discovered more than one year later that they had no such plan. Plaintiffs further proved that Northwestern Mutual was negligent and wanton in its contracting of Behr, its monitoring of him, and its failure to detect and deter his fraudulent activities while he was an agent for the company. It is this latter claim of plaintiffs which distinguishes this case from other 'renegade agent' cases; plaintiffs alleged and proved at trial that Northwestern Mutual played an active role in allowing Behr to defraud plaintiffs and at least fifty additional Northwestern Mutual policy owners.
 "Clear and convincing evidence was presented at trial that Northwestern Mutual was aware of the fraudulent activities on the part of its District Agent long before Behr took money from these plaintiffs. . . . In considering the degree of reprehensibility of Northwestern Mutual's conduct, this court considered the duration of the conduct, the degree of Northwestern Mutual's awareness of the hazard which the conduct caused or is likely to be caused in any concealment or cover up of that hazard, and the existence and frequency of similar past conduct. . . . Evidence was presented at trial that throughout his career with Northwestern Mutual, Behr's wrongdoing was made known to Northwestern Mutual's president, and to numerous departments at its home office. Thus, the duration of Northwestern Mutual's wrongful conduct was the entire duration of Behr's agency with Northwestern Mutual; the degree of Northwestern Mutual's awareness of Behr's improprieties was high; and, the concealment or cover-up of the hazard consisted in Northwestern Mutual's continuing to allow Behr to represent the company.
". . . . *Page 394 
 "There was also ample evidence that Jacob Behr sold an extremely large amount of insurance for Northwestern Mutual. The jury justifiably could have believed that Behr's success at selling insurance played a key role in Northwestern Mutual's decision to allow him to represent their company. The jury indicated as much with its punitive damages award; in 1988 Behr sold $12,463,624[2] of insurance on behalf of Northwestern Mutual. Northwestern Mutual made a conscious decision to keep a top-selling agent under contract with the knowledge that he was a threat to defraud its policy owners.
 "Certainly this court is mindful that this verdict is large. Yet this court finds that the amount of the punitive damages award bears a reasonable relationship to the harm that is likely to occur from Northwestern Mutual's conduct as well as to the harm that actually has occurred. The harm which was committed is even more grievous because Northwestern Mutual kept Behr in a position of trust to further its goal of profit even though it was foreseeable to them that additional harm would occur.
 "The court finds that the economic impact of the verdict on . . . Northwestern Mutual is slight. In 1991, the company had assets exceeding $35.7 billion. Designated reserve accounts contain $2.7 billion. The company has admitted that it has sufficient resources to pay the judgment if it should be affirmed. Clearly, the financial position of Northwestern Mutual does not support any reduction in this verdict.
 "The plaintiffs provided testimony at the hearing that their attorneys had expended almost 3000 hours and had spent in excess of $110,700.00 in preparation for this case. While the law does not allow compensation to plaintiffs for this effort, public policy demands that such efforts be encouraged. Accordingly, the court finds that the verdict should be high in order to encourage plaintiffs such as these, and their attorneys, to pursue this type of case. Thus, this factor does not weigh in favor of reducing this verdict.
". . . .
 ". . . In attempting to offer evidence of the verdict's impact on the innocent third parties, Northwestern Mutual provided testimony that if this verdict is affirmed, it might pull out of Alabama and pay this verdict out of future dividends due only those policy owners who live in Alabama. This amounts to nothing more than economic coercion to which this court refuses to succumb.
". . . .
 "It is the conclusion of this court that the verdict was not based upon bias, passion, prejudice, corruption, or other improper motive, but instead was the product of the jury's careful and studious consideration of the evidence and applicable law. This conclusion is based in part on this court's observing all of the parties to the trial, their respective attorneys, and the jury and its reaction to all of the others. . . . This verdict is not so large that it goes beyond an amount necessary to accomplish these goals. This verdict will have little, if any, impact on Northwestern Mutual and other insurance companies unless it is substantial."
This Court has independently reviewed the evidence presented in this case, applying the factors set forth by the United States Supreme Court in Pacific Mutual Life Insurance Co. v.Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), including:
 "(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the 'financial position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the *Page 395 
defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation."
Haslip, 499 U.S. at 21-22, 111 S.Ct. at 1045. After applying these factors, we conclude that the verdict is excessive and must be reduced by $12,863,624.00. Consequently, the judgment of the trial court is affirmed, conditioned upon the Sheridans' acceptance within 28 days of a remittitur of $12,863,624.00, resulting in a judgment for the Sheridans in the amount of $12,863,624.00.
AFFIRMED CONDITIONALLY.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] This figure represented the total face amounts of policies sold by Behr.
[2] This figure represented the total face amounts of policies sold by Behr.