659 So.2d 897 (1995)
DUCK HEAD APPAREL COMPANY, INC.
v.
Ken HOOTS, et al.
Ken HOOTS, et al.
v.
DUCK HEAD APPAREL COMPANY, INC.
1931146, 1931171.
Supreme Court of Alabama.
February 17, 1995.
On Application for Rehearing April 7, 1995.
*898 William J. Baxley of Baxley, Dillard, Dauphine & McKnight, Birmingham, Oakley W. Melton, Jr. and Joseph C. Espy III of Melton, Espy, Williams & Hayes, P.C., and T.W. Thagard, Jr. and David R. Boyd of Balch & Bingham, Montgomery, for appellant.
Richard Jordan, Randy Myers and Benjamin L. Locklar of Richard Jordan and Randy Myers, P.C., Montgomery, for appellees.
ALMON, Justice.
Duck Head Apparel Company, Inc., appeals from a judgment awarding damages against it on the plaintiffs' claims alleging breach of contract, fraud, and suppression. The plaintiffs, Ken Hoots, Terry Long, and Bill Pace, are former sales representatives for Duck Head. The allegations of wrongful conduct concern Duck Head's failure to pay sales commissions to the plaintiffs. The plaintiffs presented substantial evidence that Duck Head's officers and managerial employees, through various improper actions, avoided paying substantial commissions owed to the plaintiffs, while fraudulently representing that the commissions would be paid and suppressing activities undertaken to make it appear that the commissions were not due and owing. The principal issues are whether the circuit court erred in ordering no larger a remittitur of punitive damages than it ordered or in denying the motion for remittitur as to the mental anguish damages awarded on the counts alleging fraudulent misrepresentation and suppression. Duck Head also argues that the court erred in excluding evidence at the hearing held pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); that the plaintiffs presented insufficient evidence of reliance on the alleged suppression; that there was insufficient evidence of the amount of damage under the *899 contract claim; and that the court erred in refusing to dismiss the claim under Ala.Code 1975, § 8-24-1 et seq.
The plaintiffs cross appeal, arguing that the circuit court erred in sealing the record, in amending its Hammond order, and in ordering a partial remittitur of the punitive damages.
Duck Head Apparel Company, Inc., is the successor to O'Brien Brothers, Inc., as owner of a trademarked line of apparel bearing a duck head as trademark. Ken Hoots began working for O'Brien Brothers in 1983 as an independent sales representative for the territory of Alabama, Georgia, and Florida. Hoots began developing the territory, paying his own expenses and earning a five per cent commission on his sales. He testified that the first year he worked he sold less than $1,000,000 in goods, earning about $50,000 in commissions but incurring expenses of $20,000-$30,000. Hoots had substantial increases in sales each year, and he testified that these increases came "by hard work." In 1984, with the approval of O'Brien Brothers, he hired Terry Long to work as a Duck Head sales representative in Georgia. In 1986, Hoots and Long lost Florida from their territory, except that Hoots retained Stein Mart stores, which ordered through the company's headquarters in Jacksonville, Florida. Hoots testified that he kept the Stein Mart account because he had opened it and had increased the number of Stein Mart stores selling Duck Head clothing from 5 to 47.
Initially, O'Brien Brothers marketed a limited line of Duck Head clothing. Hoots testified that he suggested to David Baseheart, the sales manager for O'Brien Brothers, that the company add some colorful items:
"For example, the basic pant that started to become popular with the young people, we only did it in khaki, navy, and olive. I went to Dave Baseheart one day and told him we needed some more things to sell; that I had a suggestion that we, rather than do the basic colors, put a little flare to it. Let's do it for spring. For example, do a canary, a taupe, and a light blue. Dave suggested that we maybe couldn't do that because we had a smaller warehouse in Nashville and he said we just can't stock all of this merchandise. I said, well, Dave, we don't have to stock it; just stock the basic items. We will take these new colors; you make up some samples, and we will go out and book it and ship it and forget it; then we will do three more colors next season. So we did, and it was very successful. From there we started adding colors to the shorts, and then we began to add tops, both knit and woven."
Hoots also testified that he changed the practice of marketing of Duck Head clothing from small country stores by establishing accounts with major department stores such as Gayfers, Parisian, Rich's, and Macy's. Hoots's sales increased dramatically every yearâ $984,000 in 1984, $2,114,000 in 1985, $3,468,000 in 1986, $4,405,000 in 1987, $5,679,000 in 1988, $7,619,000 in 1989, $9,950,000 in 1990, and $17,010,000 in 1991. Sales from Alabama and Georgia constituted a substantial portion, apparently more than a third, of the sales of Duck Head clothing throughout this period. Bill Pace started selling Duck Head clothing in January 1991 in an arrangement similar to Long's arrangement with Hoots. Hoots did business under the name Hoots & Associates, with Long's and Pace's sales credited to Hoots's account and with Hoots paying Long and Pace from the commission checks he received.
In December 1988 Delta Woodside Industries, Inc., bought O'Brien Brothers, Inc. Delta Woodside formed Duck Head Apparel, Inc., as a subsidiary corporation and marketed the Duck Head clothing through that corporation. In 1989, Danny Stanton was made president of Duck Head Apparel.[1] In September 1990, Mark Schwarb came to work for Duck Head and was made vice president for sales and marketing in early 1991. In April 1991, Schwarb sent a letter to the sales representatives informing them that the commissions would be reduced from 5% to 4 or 3%, depending on the account. Sales to new specialty stores were allowed higher commissions, *900 but Hoots and Long testified that the market was so saturated in their territory that this provision meant little to them. All orders received by Duck Head by May 1 were to receive the old 5% commission rate, but problems arose with orders being incorrectly credited at the new rates.
In August, Schwarb told Hoots that he would not receive credit for Stein Mart orders after August 20, because Stein Mart was being made a "house account" that did not pay commissions. Also in the spring and summer of 1991 problems arose with commissions on orders from J.C. Penney stores that were transmitted electronically by the stores. The salesmen complained that they were not receiving commissions on these orders, and they testified that when they told this to the Duck Head managers and officers, the response was "we'll look into it," but that the commissions were never paid.
On November 1 or 2, 1991, a sales meeting took place in which Schwarb and Stanton informed each representative individually that Duck Head Apparel would no longer pay commissions to independent sales representatives, but would hire employee sales representatives, paying a salary plus a certain amount for expenses and a ―% commission. This offer was memorialized in a memorandum from Mark Schwarb on November 5, which stated the following:
"In the event that a sales representative resigns prior to June 28, 1992, commissions at the current schedule will be paid on all orders booked prior to resignation and shipped through June 28, 1992. Orders booked prior to resignation and shipped after June 28, 1992, will be paid at ― percent of net sales amount."
This representation was important to the salesmen, because the orders were booked a season in advance; in the fall of 1991, the salesmen were booking orders for shipment in the spring of 1992. The compensation offered to Hoots, Long, and Pace constituted a substantial pay cut, and they unanimously decided to terminate the relationship rather than become salaried employees. Their resignations had an effective date of November 30, and they continued to book orders until then. At trial, each of the three testified that he decided to quit immediately, rather than working through the end of June and monitoring the shipments to make sure he received proper credit, and that in deciding to do this, he relied on the representation that they would be paid commissions at the existing rates.
There was evidence that by November 1991 Duck Head had already begun tampering with orders submitted by Hoots, Long, and Pace to prevent them from receiving the commissions they were due. Stacey Shipley and Stacy Kitchens worked in the customer service department at Duck Head and were responsible for the accounts served by Hoots, Long, and Pace. They received orders from the sales representatives and entered the information into Duck Head's computers. They both testified that they began noticing on their computer screens orders that had been submitted by Hoots, Long, and Pace but that were shown as credited to a "house account," which paid no commission, or to a "resignation account" for Hoots & Associates, which paid no commission. Shipley testified that she began noticing this before Hoots, Long, and Pace had resigned. Later, they also noticed that commissions for Hoots & Associates' orders were credited on some computer entries to other salesmen who came to work after Hoots, Long, and Pace resigned. Both Shipley and Kitchens testified that they ultimately noticed "hundreds" of such questionable alterations of orders.
Shipley testified that she told her supervisor, Suzanne Barckow, and asked her why the changes had been made, but Shipley said, "She told me that was not my job; I had a job to do, and I was not to worry about that." She also told another supervisor, Sandy Campus, and was told "It was none of my business." Finally, she told the manager of customer service, Ken Grindle, who gave her the same response, "That was not my job, to worry about them." She said that she felt as if it was her job, because, she said, her job was to help the salesmen place orders and help the customers receive orders. She talked to Hoots about it, and he was unaware of the changes being made, so she started sending printouts to Hoots. After she had sent several such printouts, one was intercepted *901 by Mat Einsmann, the new manager of customer service, who sent it to Schwarb with an attached note stating, "Mark, this is the document Ken is asking Stacey Shipley for; it's in your hands now." When Duck Head was asked to produce this printout, it said that it was unable to locate it, but when Hoots, Long, and Pace were given access to Duck Head's files during discovery, they found the printout with the note attached.
Duck Head instructed Hoots not to communicate with its customer service employees. It also required its employees to sign agreements not to communicate with the former sales representatives.
The plaintiffs submitted voluminous detailed evidence of various alterations of orders intended to prevent payment of commissions to Hoots & Associates, but the witnesses testified that even though they had testified to many alterations, the instances they had told of were only representative, that there were too many to set forth all of them. The conduct included:
â wrongfully changing orders to create the appearance that no commission was due because the order was a "house account" or was placed under the plaintiffs' supposed "resignation code," which did not pay commissions to them.
â holding orders that were received before November 30 until after that date and only then entering them in the computer; doing this made it appear that the orders were received after the date of the plaintiffs' resignations.
â supposedly establishing a rule that orders would not be entered unless fully completed on Duck Head order forms, but then enforcing this rule only against Hoots & Associates and other salesmen also earning high commissions, but not against the new salesmen earning ―% commissions. Kitchens testified that Barckow took a large order submitted by Hoots off her desk three times on the pretext that it needed to be completed, although, she said, nothing was wrong with the order. Grindle finally brought it back for entry into the computer before Hoots's resignation was effective, but after Hoots's resignation Kitchens tried to look at the order in response to an inquiry from the customer and could not find it in the computer. It was later rewritten and the new salesman received the commission.
â cancelling orders that had been entered and re-entering them under the new salesmen's account numbers so that the order would pay only a ―% commission.
â when customers returned merchandise or otherwise earned credits, applying the credits against Hoots & Associates' account even if the credits applied to sales by the new salesmen. Rita Riner, who handled commissions for Duck Head, testified by deposition that Schwarb told her to do this.
Rita Riner also testified in her deposition that after the May 1, 1991, reduction in rates some orders that should have received commissions at the old rates were paid commissions at the new rates, but that when she told Schwarb and tried to get the errors corrected, she "didn't get a lot of response."
Other salesmen, Donnie Cecil and David Baseheart (who had become a salesman after Delta Woodside brought in new officers and managers), testified to similar problems. They, and apparently other former sales representatives, had actions pending. All but Cecil had settled by the time of the trial court's post-trial Hammond hearing, for relatively small amounts that the parties concede did not include punitive damages.
Even Duck Head's customers were aware that Hoots & Associates' orders were being tampered with. Neil Kapolwitz, an owner of Buckhead Men's Store in Atlanta, testified. An order he placed with Long on October 3, 1991, did not arrive when scheduled, so he telephoned Duck Head in early February and spoke to Suzanne Barckow. She told him that "they had never gotten that order," and when he asked where it was, she said, "Well, [Long] was leaving the company, and he probably just never turned it in." Kapolwitz had kept a copy of the order, and he sent it to Duck Head by facsimile transmission in February. When he started receiving the goods, he notice that the new salesman, Pearly Gates, was receiving the commissions, although Gates had had nothing "whatsoever" to do with the order. Later, he noticed *902 that Duck Head's paperwork showed a January date on the order:
"Q. Now do any of those documents that you found [in your files] from Duck Head evidence that they had your order as early as January?
"A. It was strange. I noted that the order I sent them in February now has a date on it. It says order date January 29th, '92.... Which they said they didn't have.
"Q. And that would be 5 days prior to your refaxing it?
"A. Yes, sir."
In conjunction with the evidence from Shipley and Kitchens that Duck Head was cancelling orders and re-entering them under the new salesmen's commission codes, this evidence would support a finding that Duck Head had cancelled Long's October 3 order and re-entered it on January 29, shortly before Kapolwitz transmitted it by facsimile.
Similar evidence was given by Michael Gee, who owned a retail store in Talladega, Alabama. He testified that Hoots had introduced him to the Duck Head line in the early 80's and that he had been selling it since. He testified that he telephoned in February 1992 to inquire about an order for which delivery was late. The Duck Head employee to whom he spoke told him "there is no order like that." However, Gee had received a pre-print of the order, which had an order control number and showed that Hoots had placed the order on September 16, 1991. The evidence established that Duck Head's computer assigned order control numbers when the order was entered in the computer, so that Gee's possession of an order control number necessarily meant that the order had been entered in the computer. However, when he told the Duck Head employee on the telephone the order control number, she said that there was no order with that number. He ordered the same merchandise again, but he noticed when it arrived that Tommy Wall, the salesman who took over Hoots's territory, received the commission. Gee testified that he had not met Wall at that time.
The evidence tended to show that Hoots & Associates booked over $38,000,000 in orders for shipment in the winter and spring of 1992; that about $31,000,000 of these orders were actually shipped; and that Duck Head paid commissions to Hoots & Associates for about $7,800,000 of these orders. Duck Head claimed at trial that large numbers of Hoots & Associates's orders were cancelled because customers overbooked, but the evidence did not support an additional $23-24,000,000 in cancellations, the amount that would be necessary to support the difference between what Duck Head shipped and what it claimed it owed in commissions. Duck Head defended on several grounds, such as its assertions that there were large cancellations, that many of Hoots & Associates' fall 1991 orders were either incomplete, late, or otherwise not entitled to commissions, and that many of the spring 1992 shipments were pursuant to "at once" orders by new salesmen. The plaintiffs presented evidence refuting all of these defenses, and the jury's verdict indicates that it believed the plaintiffs and not the defendants.
On the contract count, the circuit court instructed the jury to treble the damages pursuant to Alabama Code 1975, § 8-24-1 et seq., and the jury returned a verdict of $2,556,353.60. Pursuant to later proceedings, the plaintiffs accepted a remittitur of the treble damages and a judgment was entered on the contract count in the amount of $852,000. The jury returned a verdict for the plaintiffs on the fraud count, awarding Ken Hoots $4,000,000 compensatory damages for mental anguish,[2] Terry Long $2,000,000 for mental anguish, and Bill Pace $1,000,000 for mental anguish. The verdict on the fraud count awarded $19,500,000 to the plaintiffs collectively in punitive damages, but the circuit court ordered a remittitur of that amount to $15,000,000.
The first issue is whether the circuit court erred in denying Duck Head's motions for J.N.O.V. or new trial on the contract claim, which Duck Head sought on the *903 ground that the evidence was insufficient to show the amount of commissions the plaintiffs were entitled to recover. Duck Head cites the following rule:
"[T]he party claiming damages has the burden of proving the existence of and amount of those damages by competent evidence.... The award of damages cannot be made upon speculation, and the plaintiff has the burden of offering evidence tending to show to the required degree, the amount of damages actually suffered."
Johnson v. Harrison, 404 So.2d 337, 340 (Ala.1981) (citations omitted); Livingston v. Tapscott, 585 So.2d 839, 841 (Ala.1991); Segars v. Reaves, 567 So.2d 249, 250 (Ala.1990). Duck Head also cites Chestnut v. Laramore, 560 So.2d 1070, 1072 (Ala.Civ.App.1990), for the proposition that the plaintiffs were not entitled to recover damages unless they showed with "as much certainty as the situation permits" a foundation to permit the jury to make a fair and reasonable estimate of the amount of damages. The opinion of the Court of Civil Appeals in Chestnut actually states:
"Simply because the amount of damages in a breach of contract case cannot be assessed precisely does not preclude the right to a damages award. Farmer v. Strother, 423 So.2d 252 (Ala.Civ.App.1982). `All that is required is that the evidence, with as much certainty as the situation permits, lay a foundation with which the trier of fact may make a fair and reasonable estimate of the amount of damages.' Farmer."
Id.
Duck Head argues that the commission rates varied from 2―% to 7% and that the plaintiffs did not show the rate of commissions due on the sales for which they sought commissions. It states, "Even if one concedes that there were $31,048,494.00 sales to Alabama and Georgia in the pertinent time, there is no way to determine the plaintiffs' damages without knowing what commission rate to apply to the orders shipped." Furthermore, argues Duck Head, the plaintiffs did not subtract the sales to accounts for which they were not due to receive commissions, the sales of goods that were returned by the customers, or the "at once" sales by new salesmen. Finally, Duck Head argues, even calculating a 4% commission by deducting from $31,048,494 the amount of sales on which plaintiffs were paid commissions, $7,794,267.09 in sales for which they were initially paid, plus another $1,266,000 in sales for which they were paid commissions the Friday before trial, a 4% commission on the remaining sales of $21,212,013.56 would only be $848,480.54, less than the $852,000 contract award.
The plaintiffs respond to this argument by arguing both the law and the facts. Without conceding that they failed in their proof, they argue that any difficulty they had in proving the amount of damages they were entitled to "was due to Duck Head's manipulation of records and the production of false and erroneous information." They cite Money Back, Inc. v. Gray, 569 So.2d 325 (Ala.1990), and Super Valu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala.1987), for the proposition that difficulty in proof of damages that is caused by the defendant's wrongful conduct will reduce the plaintiff's burden of specificity of proof of damages. The plaintiffs cite several examples of the difficulty caused by Duck Head. Duck Head asserted that it did not have a report of open orders placed by Hoots, Long, and Pace as of November 30, 1991, and that such a report could no longer be produced. However, Rita Riner, who was responsible for paying commissions, testified by deposition that she had run such a report "and turned it over to someone else." The plaintiffs also point out numerous problems they had with discovery from Duck Head. For example, computer printouts the plaintiffs received gave information for the whole country, not just for the plaintiffs' territory.
The plaintiffs also argue that the evidence supports the amount of the damages. They calculate that 4% commissions on the entire amount of shipments to Alabama and Georgia in the spring of 1992 would equal $1,241,939.70, and that deducting the $311,770 in commissions they were actually paid would leave $930,169 due. Thus, they say, the jury, in setting damages at $852,000, did allow for adjustments such as "at once" sales. On the *904 issue of whether the sales figures for Alabama and Georgia were overinclusive because Hoots & Associates did not receive commissions on all sales in these states, Ken Hoots testified that those figures were also underinclusive because they received commissions on some out-of-state sales such as Stein Mart and some Gayfers stores, and that the difference was basically a "wash." Regarding the use of 4% as the rate of commission, Ken Hoots testified that this was the average of the commissions he received. Furthermore, Douglas J. Stevens, who was Duck Head's vice president for finance in 1991-92 and who was comptroller for Delta Woodside at the time of trial, testified that "there was a sliding commission [scale], but I think the bulk of the plaintiffs' commissions settled on four percent."
Perhaps most damaging to Duck Head's argument is the fact that its attorney stated at a pre-trial hearing on the plaintiffs' motion to compel production:
"We are not going to get into sitting here and trying to tell a jury what happened with a hundred thousand orders. I don't think the court would tolerate it. I don't think the jury would. I don't think either party can afford it.
"This case is going to be tried, I think, on general data and general information."
Given the large amount of information involved, the plaintiffs did an admirable job of presenting specific evidence from which the jury could calculate the amount of damages to be awarded. The jury awarded nearly $80,000 less than the plaintiffs claimed and only about $3500 more than Duck Head essentially concedes was supported by the evidence when viewed in a light most favorable to the plaintiffs. The circuit court did not err in denying Duck Head's motion for a J.N.O.V. or a new trial on this ground.
The second issue is "Whether the trial court erred in refusing to dismiss plaintiffs' claim brought under the Alabama Sales Representative's Commission Contracts statute, Ala.Code [(1975)], § 8-24-1 et seq." The plaintiffs did not make a separate claim based on these Code sections, however; the contract count simply requested attorney fees (the request was not submitted to the jury) and treble damages pursuant to § 8-24-5. At the close of the evidence, the plaintiffs asked the judge not to instruct the jury on the statute, but Duck Head's lawyer[3] requested that the jury be instructed on the statute. The plaintiffs argued that Duck Head was thereby waiving any objection to the statutory claim, but the judge granted Duck Head's request and read or paraphrased these sections to the jury in relation to the contract claim and instructed the jury to treble the contract damages. Thus, Duck Head cannot be heard to complain, because it requested the charge instructing the jury to treble the damages.
Even if Duck Head did not waive its objection, there is in fact no reversible error. The only aspect of the statute that could have had any effect on the verdict was the provision for treble damages in § 8-24-5. The jury did in fact treble the damages, but the circuit court, in response to Duck Head's post-judgment motion, required the plaintiffs to choose between the trebled damages and the punitive award, viewing the two as a double recovery or double punishment. The plaintiffs chose the punitive damages, and the contract damages were reduced to the direct compensatory amount. As shown above, the evidence supported the award of contract damages without reference to §§ 8-24-1 through -5, and those sections had no relation to the fraud claim. Therefore, any issue as to the applicability or constitutionality of §§ 8-24-1 through -5 is moot, and no reversible error is presented in respect to this issue.
The third issue is whether the circuit court erred in not granting a J.N.O.V. or a new trial on the ground that the plaintiffs did not present "sufficient evidence of reliance to support plaintiffs' fraudulent suppression claim."
"To prove suppression of a material fact, a plaintiff must establish (1) that the defendant had a duty to disclose that fact, (2) that the defendant concealed or failed to disclose that fact, (3) that the concealment *905 or failure to disclose induced the plaintiff to act, and (4) that the action caused injury to the plaintiff. Ala.Code 1975, § 6-5-102."
Baker v. Bennett, 603 So.2d 928, 935 (Ala. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1260, 122 L.Ed.2d 658 (1993); Hardy v. Blue Cross & Blue Shield of Alabama, 585 So.2d 29, 32 (Ala.1991).
Duck Head argues that the alleged suppression occurred, if at all, after the plaintiffs had resigned, when Duck Head allegedly suppressed the fact that it was diverting the plaintiffs' orders to prevent paying commissions on them. In particular, Duck Head asserts that the suppression is alleged to have occurred on December 12, 1991, when Danny Stanton, the president of Duck Head, wrote a letter to the plaintiffs regarding payment of commissions. The plaintiffs tendered their resignations on November 19, and the resignations were effective on November 30. Thus, argues Duck Head, the plaintiffs could not have been induced to act to their injury by any suppression by Duck Head of material facts that it was under a duty to disclose. Duck Head cites Sanders v. Kirkland & Co., 510 So.2d 138, 141 (Ala. 1987), for the proposition that action taken before an alleged misrepresentation is made could not have been taken in reliance on the misrepresentation, and it argues that the same principle holds true for suppression.
The problem with Duck Head's argument on this point is that the plaintiffs presented evidence that Duck Head had begun its wrongful activities in regard to the plaintiffs' orders before they resigned. The plaintiffs submitted large amounts of documentary evidence, and several orders they submitted before the beginning of November showed in Duck Head's records as having been submitted in December or January. Plaintiffs' exhibit 31 showed a credit entered on or before November 2 to the "house account," for which commissions were not paid. Bill Pace testified regarding this exhibit:
"This is the invoice detailed listing. It showsâ for example, store number 2203, and that's Valdosta, Georgia. It shows where the shipment was invoiced on 11/2/91; so that means that I had to have written that order well before that date which was before our resignation date. And the house gets the account."
In addition to the documentary and circumstantial evidence, the plaintiffs presented the testimony of Stacey Shipley that she started seeing cancellations of Hoots's orders or credit for his orders being assigned to house or retirement accounts "before his termination."
Furthermore, the plaintiffs assert that the suppression of the efforts to deprive them of commissions occurred simultaneously with the fraudulent misrepresentation in Schwarb's memo of November 5 stating that Duck Head would pay commissions on all orders placed before their resignations that were shipped by June 28, 1992. By September or October 1991, Duck Head began planning to change to employee sales personnel, with an aim of saving money. The jury could infer that Duck Head anticipated that the highest-paid sales representatives would not accept its offer of employment and that it began making plans and taking steps to defraud them of their commissions in the event they resigned. Thus, the jury could have found that Duck Head suppressed facts existing before the plaintiffs' resignations and that the plaintiffs were induced by that suppression to act.
The foregoing issues are the only issues attacking the judgment in regard to the submission of the case to the jury, so the judgment on its merits is due to be affirmed. The remaining issues pertain to Duck Head's request for a remittitur, which is presented by a motion for a new trial or, as a condition of denial of that motion, for a remittitur. Rule 59(f), Ala.R.Civ.P. Section 12-22-71, Ala.Code 1975, provides for remittitur on appeal where the only ground for reversal would be excessiveness of the judgment.
Pursuant to Duck Head's motion for new trial or remittitur of the punitive damages, the circuit court held a hearing, as required by Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). Duck Head raises two issues regarding the punitive damages award and the Hammond/Green *906 Oil Hearing: one, that the court erred in excluding certain evidence offered by Duck Head, and two, that the court erred in not ordering a larger remittitur of the punitive damages. Duck Head also argues that the award of mental anguish damages on the fraud counts was excessive. We shall address the award of mental anguish damages first.
All three of the plaintiffs testified that they suffered mental anguish as a result of Duck Head's actions. Ken Hoots's testimony on the subject was brief, but he became so distraught that he was unable to continue:
"Well, it's been pretty tough to handle. When you build up a territory and you spend 8, 9 years of your life and you finally achieve the goal and you're having fun and you do a job that you feel like you should do and that everybody admires you for doing, all of a sudden, to have the rug pulled out from under you, it's tough. Not only have I suffered but so have Terry and Bill. I have talked to psychologists about it. That's all I can say. It's just hard to handle."
Terry Long testified as follows:
"I think Ken summed it up real well. He didn't go in the detail like I will. It's just like someone you know breaking into your house and stealing everything you own. To expect something that you have worked hard for and have it taken away from you, from that day, even all the way of what we have had to do in preparation of this lawsuit is extremely depressing and causes the anger thatâ an anger that I've never had towards someone like this. We built the line up and spent our money and were almost bankrupt 7 or 8 years ago and developed and made this company. Mental anguish is like listening to Lovic Brooks [Duck Head's attorney] say that the last couple of years, our territory did so well because of the advertising and the big company backing us. Well, our territory increased every single year by a tremendous amount without the advertising. And in my opinion, it's not us that were along for the ride the last couple of years enjoying the benefits. I think it was just quite the opposite. We didn't jump on the boat when Delta Woodside was running the company; Delta Woodside jumped on the boat after we got it started."
Long also testified that it was humiliating that Duck Head offered him one of the lowest salaries it offered for employment of salesmen, although he and Hoots were the top two salesmen for the company. Long's cross-examination by Duck Head's attorney included the following exchange:
"Q. And then you are claiming fraud. The fraud is based on the withholding of information or falsely misstating information. Do you understand that?
"A. Yes, I do.
"Q. And your mental anguish relates to the fraud?
"A. Correct."
Bill Pace testified as follows regarding his claim of mental anguish:
"Well, I was furious at the thought of being offered 42,000 when I had already made 125,000. I was making them a lot of money. I had not been with the company as long as Terry and Ken and they made this possible for me; but I still got out there and worked and produced this, and I made these people a lot of money, I felt like. And I was doing better for this next season than I had the season before. Like I said, I was only with them a year. So I was furious about it. I was even more furious when I found out that the commissions that I did earn were going to other salesmen, and they were going to the house account where nobody got paid, and then it was subsequently going into what was called a pot or a pool where other people benefited from it. So, you know, when I quit or when I resigned, I felt like I had some money coming; and I was making arrangements with that money. That's what I was planning."
Pace's remark about a "pool where other people benefited from it" refers to Duck Head's EBIT account, which was a profit sharing plan for Duck Head's officers and managers. The plaintiffs presented evidence that the decrease in commissions payable to them caused this pool to increase, and that Stanton, as president, received the largest *907 share of the increase. The plaintiffs argued that this pool provided a motive to the officers and managers to deprive the plaintiffs and others of commissions, and they argued, as Pace testified, that it was offensive to them that these people would profit from wrongfully depriving them of commissions.
Duck Head argues that much of the evidence of mental suffering is not relevant to any compensable injury, because it pertains to the termination of the plaintiffs' lucrative sales jobs, not to any wrongful conduct on Duck Head's part. However, Duck Head did not object to any of the above testimony or to other testimony given by Long and Pace about the effect of Duck Head's actions on their family life and personal plans. Duck Head also argues that, to the extent there was evidence of compensable mental anguish, the awards are excessive.
In its well-written order on the post-judgment motion, the circuit stated in regard to mental anguish damages:
"Black's Law Dictionary defines `mental anguish' as follows:
"`... an element of damages, it includes the mental suffering resulting from the excitation of the more poignant and painful emotions, such as grief, severe disappointment, indignation, wounded pride, shame, public humiliation, despair, etc.'
"When assessing the question of excessiveness of compensatory damages, the focus is on the Plaintiff, as stated in Pitt v. Century II, Inc., 631 So.2d 235 (Ala.1993):
"`A court reviewing a verdict for compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective. Bridges v. Clements, 580 So.2d 1346, 1349 (Ala. 1991).'
"There is no fixed standard for ascertainment of compensatory damages for mental anguish. A determination of how much to award is left to the sound discretion of the jury, subject only to the correction of the Court for clear abuse or passionate exercise. Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975).
"The Court charged the jury that the verdict should be fair and impartial, that they should observe the witnesses not merely for what they said but also their demeanor and how they responded to questions. The Court also charged the jury that the verdict should not be based on bias, prejudice or sympathy. In addition, the Court instructed the jury on reasonable inferences which are conclusions which reason and common sense leads the jury to draw from the facts which have been established by the evidence in the case.
"The jury, within its sound discretion, found in favor of Plaintiffs on their claims for mental anguish and awarded Plaintiffs damages as hereinabove stated. There was sufficient evidence for the jury to so find. Thus, the Court will not substitute its judgment for that of the jury. Accordingly, the Defendant's Motion for Remittitur of the mental anguish damages is hereby DENIED."
In addition to the direct testimony by the plaintiffs, there was substantial circumstantial evidence that Duck Head's wrongful conduct of misrepresenting and suppressing its intent to deprive the plaintiffs of commissions caused them to suffer mental anguish. Duck Head told former customers of Hoots & Associates that the salesmen had not turned in their final orders. This evidence would support the mental anguish award due to the embarrassment of Hoots, Long, and Pace in learning that, as part of Duck Head's fraudulent scheme to deprive them of commissions, they were being accused of neglecting their customers, with whom they had cultivated a relationship of trust and respect over the years. Furthermore, the jury could find that Duck Head's attempt to minimize the contributions of Hoots & Associates in the growth of the sales of Duck Head clothing was an affront to their career efforts on behalf of the company. Finally, Duck Head actually accused the plaintiffs of wrongful conduct in the form of padding their orders in their final months of work. The plaintiffs learned of these matters in preparation for and during trial, and the jury could find that their mental anguish and humiliation continued *908 and even increased after they had filed this action.
Duck Head cites Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994), and Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994), as recent cases in which this Court has ordered remittiturs of compensatory awards that included mental anguish damages, and argues that the awards here should be reduced substantially. In contrast to Foster and Sears, however, the appellant in Northwestern Mutual Life Ins. Co. v. Sheridan, 630 So.2d 384 (Ala.1993), did not attack as excessive an award of $800,000, principally consisting of mental anguish damages, Northwestern arguing only that the punitive damages award was excessive.
A jury award is entitled to the constitutional protection of the right to trial by jury guaranteed by § 11 of the Alabama Constitution of 1901.
"When there is no evidence before the court of any misconduct, bias, passion, prejudice, corruption, improper motive, or cause not consistent with the truth and the facts, there is no statutory authority to invade the province of the jury in awarding compensatory damages. Northeast Alabama Regional Medical Center v. Owens, 584 So.2d 1360, 1366 (Ala.1991)."
Pitt v. Century II, Inc., 631 So.2d 235, 240 (Ala.1993). "[T]he interest of the victim must always be kept foremost in mind when reviewing the propriety of a compensatory damages award, Wilson v. Dukona Corp., N.V., 547 So.2d 70 (Ala.1989); Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989)." Bridges v. Clements, 580 So.2d 1346, 1349 (Ala.1991); Pitt, supra.
Duck Head argues that some of the plaintiffs' testimony related to their distress at losing their jobs. Although the plaintiffs do not argue that they had a right to keep their positions, their complaint is with the humiliating manner in which Duck Head, through its fraudulent conduct, pushed them out and afterwards demeaned their work and attempted to deprive them of their earned commissions. Nevertheless, because the jury could have been persuaded by their testimony to award a portion of the mental anguish damages based on their testimony of remorse at losing their positions, a remittitur is in order. Therefore, this Court will affirm the judgment as to the mental anguish damages conditioned upon an acceptance by Ken Hoots of a remittitur of $2,000,000 of the award in his favor; an acceptance by Terry Long of a remittitur of $1,000,000 of the award in his favor; and an acceptance by Bill Pace of a remittitur of $500,000 of the award in his favor.
We now turn to the issue of the circuit court's remittitur of $4,500,000 of the $19,500,000 punitive damages award. Duck Head argues that more should have been remitted; the plaintiffs argue that the entire verdict should stand.
Duck Head also argues that the circuit court erred in excluding evidence that it offered in an attempt to show detailed comparison of this verdict with awards in other cases. However, the comparison of other cases with the case under review is only one factor among many factors that this Court has used in determining whether punitive damages are so large as to implicate a defendant's right to due process of law and warrant a remittitur of a jury verdict. Moreover, the United States Supreme Court, in TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, ___, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993), discounted the value of comparing one punitive damages verdict to another:
"We question, however, the utility of such a comparative approach as a test for assessing whether a particular punitive award is presumptively unconstitutional.
"It is a relatively straightforward task to draw intrajurisdictional and interjurisdictional comparisons on such matters as the definition of first degree murder (Schad [v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)]) or the penalty imposed on nonviolent repeat offenders (Solem [v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)]). The same cannot be said of the task of drawing such comparisons with regard to punitive damages awards by juries. Such awards are the product of numerous, and sometimes *909 intangible, factors; a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it. Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make. Cf. [Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1] at 41-42 [111 S.Ct. 1032, 1055-1056, 113 L.Ed.2d 1 (1991)] (Kennedy, J., concurring in judgment). Such analysis might be useful in considering whether a state practice of permitting juries to rely on a particular factor, such as the defendant's out-state status, would violate due process. As an analytical approach to assessing a particular award, however, we are skeptical. Thus, while we do not rule out the possibility that the fact that an award is significantly larger than those in apparently similar circumstances might, in a given case, be one of many relevant considerations, we are not prepared to enshrine petitioner's comparative approach in a `test' for assessing the constitutionality of punitive damages awards."
(Emphasis in original.)
This case has dubious comparability to other cases, if only because of the unusually high actual damage that was proved and because of the evidence of concerted fraud against valuable sales representatives by upper-level managers and officers. The circuit court held a Hammond/Green Oil hearing that lasted three days. Such hearings were not intended to become second-phase trials of cases. The court admitted extensive evidence, including evidence concerning awards of punitive damages in other cases. The court did not abuse its discretion in excluding the evidence in question, and Duck Head's right to due process was not infringed.
In regard to the remittitur of punitive damages, the circuit court stated the following in its order issued after the Hammond/Green Oil hearing:
"A hearing was held beginning March 7, 1994, at which time the parties offered evidence which they considered to be relevant to the issues and principles established in Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986), Green Oil Company v. Hornsby, 539 So.2d 218, 223-224 (Ala.1989), and the provisions of § 6-11-23(b), CODE OF ALABAMA (1975).
"The Alabama Constitution of 1901, Article I, Section 11, provides `[t]hat the right of trial by jury shall remain inviolate.' By statute and constitution, it is the function of the jury to determine the amount it considers necessary to vindicate the public interest by eliminating the reprehensible conduct of the defendant and by punishing the defendant appropriately. Bozeman v. Busby, 639 So.2d 501 (Ala.1994).
"The Court's authority to review an award of punitive damages is made possible by virtue of the procedures set forth in Hammond v. City of Gadsden, Green Oil Co. v. Hornsby, and § 6-11-23(b), CODE OF ALABAMA (1975). The constitutional protection of a jury verdict may only be disturbed when a verdict is so excessive or out of proportion to the wrong committed by the individual defendant as to violate the defendant's right not to be deprived of property without due process of law. Henderson v. Alabama Power Company[, 627 So.2d 878 (Ala.1993)]. See also TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, 113 S.Ct. 2711 [125 L.Ed.2d 366] (1993).
"Section 6-11-23(b), CODE OF ALABAMA (1975), and case law set forth numerous factors which may be considered by the trial court on the question of excessiveness of punitive damages, as follows:
"(1) Culpability of defendant's conduct.
"(2) Desirability of discouraging others.
"(3) Impact on the parties.
"(4) Impact on innocent third parties.
"(5) Relationship between actual [or] potential harm and the amount of the verdict.
"(6) Degree of reprehensibility of defendant's misconduct, including duration, defendant's awareness, harm caused or likely to be caused by defendant's conduct and any concealment or cover-up.
"(7) Whether defendant profited from its activities.
"(8) Financial position of defendant.
"(9) Costs of litigation.

*910 "(10) Criminal sanctions.
"(11) Other civil actions.
"(12) Availability of liability insurance.
"(13) Comparative analysis of similar cases.
"(14) Actual/compensatory damages awarded.
"(15) Efforts by defendant to remedy the wrong and the opportunity or lack of opportunity that plaintiff gave defendant to remedy the wrong.
"Alabama's system of review of punitive awards, based on these factors, was approved by the United States Supreme Court in Pacific Mutual Life Insurance Company v. Haslip, 499 U.S. 1, 111 S.Ct. 1032 [113 L.Ed.2d 1] (1991).
"A jury is given much discretion in setting an amount of punitive damages, but that discretion is not unlimited. Both the Alabama Legislature and the Supreme Court of Alabama, in a manner approved by the Supreme Court of the United States, have mandated an independent review of an award of punitive damages which is attacked as excessive. As stated in Green Oil, 539 So.2d at 222:
"`Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence.'
"This court, then, must determine whether, under the evidence presented in this particular case, the sum of $19,500,000 exceeds an amount that will both punish Duck Head and deter it and others similarly situated from committing similar wrongs in the future.
"The evidence established specific harm that was caused to the Plaintiffs by having commissions to which they were entitled wrongfully taken by the Defendant. Thus, the Plaintiffs were harmed by not having their earnings, and that harm certainly was not slight. The amount of $852,000, which is the amount established by the jury before trebling same, is more than the combined net worth of all three Plaintiffs.
"Duck Head's conduct was reprehensible. Its action was calculated and intentional. Furthermore, it was done in bad faith. The evidence showed that management at all levels, after being made aware of the fraudulent action taking place, made no concentrated effort to remedy the situation. Even more reprehensible is the fact that Defendants' action occurred in one of its best financial years, during which it had $130,000,000 in sales. Delta Woodside's net profit was almost $40,000,000 in the same fiscal year.[[4]]
"The evidence further showed that the Defendant profited substantially from its wrongful conduct in a sum approaching almost $1,000,000, and that certain management members also profited from the bonus pool which was tied directly to income and expenses of the Defendant.
"In Green Oil, the Supreme Court of Alabama quoted with approval from a concurring opinion of Justice Jones in Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125, 127 (Ala.1981):
"`We are all in agreement that the award in the instant case ought to be large enough to hurt. It ought to sting in order to deter; that is its purpose. But only in the rarest of cases should it be large enough to destroy; this is not its purpose.'
"Thus, the financial position of the Defendant is to be considered in determining the amount of damages necessary to punish the Defendant, which is then weighed against the gravity of the wrongful act, to determine what amount will accomplish the ultimate purpose of punitive damages. See footnote 4, infra.

"At the evidentiary hearing, the Plaintiffs produced substantial evidence that *911 payment of the judgment in this case would not endanger or threaten the Defendant's current or future operations. Defendant's management's statements, as well as their actions in responding to the judgment, were consistent with this proof. For instance, Defendant's management issued a press release and made a public filing with the Securities and Exchange Commission to the effect that the after-tax treatment of the judgment was approximately $18,000,000 and that the judgment would not `endanger the company.' Management requested and received a waiver of certain ratio requirements in its credit agreement with its credit facilities. Management further requested and received an extended line of credit in the form of a letter of credit to pay the judgment in the event the same is not reduced or reversed. There was no evidence offered that Defendant's stock has been impacted in the least since public announcement of the judgment. There was evidence offered, however, that established that Defendant has approximately $51,000,000 in primary and excess insurance coverage provided by several liability insurance companies and that the Defendant has already filed suit against its primary carrier claiming punitive damages for bad faith refusal to provide coverage.
"Plaintiffs admitted into evidence Defendant's own projections (made in January and February, 1994, some three months after the judgment in the case) which indicated a significant increase in sales, profit and stockholders' equity during the next four years. Defendant's own expert witness testified that the forecasts were management's `best judgment' as to what would happen in the future, even though Defendant argued that the projections were not reliable and that payment of the judgment would be devastating. Plaintiffs also produced evidence that the company's ability to pay dividends would not be impaired, as evidenced by the fact that a dividend has been declared since the judgment in this case.
"Whatever impact payment of the judgment will have on the Defendant4 pales in comparison to the impact of the wrongful taking on the Plaintiffs. The wrongful taking of Plaintiffs' earned commissions by the Defendant represents more than 100% of the Plaintiffs' combined net worth. The evidence indicated that Plaintiffs' expected income for calendar year 1992 was projected to be substantially more than 1991 and that, as a result of said wrongful taking by the Defendant, the Plaintiffs lost substantially more than half their income for the calendar year 1992.
"The parties stipulated that neither the Defendant nor any of its officers, servants or employees have been charged with any criminal charges or sanctions resulting from its wrongful conduct. Evidence was offered, however, that Defendant had been sued by several other sales representatives for the same or similar misconduct and that those cases have all been settled, except one, for modest sums of money. None of the settlements, by Defendant's own admissions, included punitive damages. The Court finds that the Defendant has not been punished for its conduct and that the punishment in this case must be substantial, not only to punish but also to deter others who have a superior position from taking property of others.
"On the question of comparability of verdicts, the Court has considered numerous documents introduced as exhibits from the Administrative Office of Courts, the Circuit Clerk's files, analyses prepared by the parties, etc., but finds said evidence to be of little value, especially in a fraud case, in that every case is different. The uniqueness of each case has been recognized by the United States Supreme Court in TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, ___, 113 S.Ct. 2711, 2720 [125 L.Ed.2d 366] (1993) (Court refused to adopt a `test' for comparing similar verdicts `[b]ecause no two cases are truly identical.').
"The Court finds that Plaintiffs never prevented Defendant from remedying the wrong. In fact, Defendant had numerous opportunities to remedy the wrong early on when Defendant's customer service personnel inquired of management why Plaintiffs' commission were being taken. The *912 Court encouraged the parties to settle before the trial and during the trial, but Defendant never made any effort to do so.
"It is the established law of this land, and this State in particular, that there need be no exact mathematical relationship between the compensatory damages and punitive damages awarded, but the Court would point out in this case that the ratio of punitive damages to actual damages is approximately twenty-three to one, and the ratio of punitive damages to the total compensatory damages awarded by the jury is approximately 2.5 to 1.5 The sheer magnitude of the actual damages in this case and the reprehensibility of the Defendant's conduct require special consideration.
"In addition to the foregoing, the Court also took into consideration the fact that there are three Plaintiffs, not just one. Also, the Court noted that Plaintiffs undertook an enormous task in prosecuting this case, at great expense, as evidenced by the extraordinary volumes of documentation introduced at trial, as well as the post-trial hearing.
"The Court finds that the jury verdict in this case was not the result of bias, passion or prejudice. The Court further finds, on the basis of all relevant factors, that a punitive award in a substantial amount is necessary and appropriate to accomplish the goal of punishing this Defendant and deterring others from similar misconduct in the future. Nonetheless, the Court finds that $19,500,000 in punitive damages exceeds an amount that is necessary to `accomplish society's goal of punishment and deterrence' and hereby ORDERS a remittitur of $4,500,000, leaving punitive damages in the amount of $15,000,000. In making this remittitur, the Court has taken into consideration the adequacy of the compensatory damages, the fact that Defendant is presently in a business down-cycle, and the fact that Defendant's liability insurance carrier is contesting coverage."
4 "The impact on the Defendant is only one factor, among many, to be considered by the Court. Even assuming the judgment has an adverse impact on Defendant, this fact must be weighed against the other facts, especially the reprehensibility of Defendant's conduct. Pacific Mutual Life Ins. Co. v. Haslip, [499 U.S. 1, 21-22] 111 S.Ct. 1032, 1045 [113 L.Ed.2d 1] (1991) (Court may consider `financial impact' on Defendant); TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, ___, 113 S.Ct. 2711, 2723 [125 L.Ed.2d 366] (1993) (same); The Enstar Group v. Grassgreen, No. 90-A-1235-N, U.S.Dist.Ct. [812 F.Supp. 1562] (M.D.Ala. 1993) (financial impact on defendant to be weighed against `gravity of wrongful conduct'); Campbell v. Williams, [Ms. 1920826, Feb. 18, 1994] [638] So.2d [804] (Ala.1994), (even though judgment could `financially destroy' defendant, this, alone, is not enough to overcome `the presumption of correctness' in favor of jury's verdict).
5 "These ratios represent $19,500,000 to $852,000, and $19,500,000 to $7,852,000, respectively."
Duck Head similarly lists the factors mentioned in Green Oil, § 6-11-23(b), and in other cases, and argues its position as to the application of each factor to the case. Because the circuit court has done such a thorough job of considering each factor, and because its conclusions are supported by the record, we see no need to discuss each factor individually.
The principal factors relied upon by Duck Head are its argument for comparison of this verdict to other cases; its assertion that the verdict is so large in comparison to its financial condition that it exceeds fair punishment; and its assertion that its conduct was not especially culpable.
As we stated above, any comparison to other cases gives little aid in determining whether this judgment is so large as to require an interference with the jury's award. This fact is illustrated by the differing approaches the parties take in making comparisons. Duck Head cites a number of cases in which this Court has ordered substantial remittiturs, often of judgments much smaller than the one at issue here, partially on the basis of comparison to "similar cases," e.g., Burlington N.R.R. v. Whitt, 575 So.2d 1011 (Ala.1990), cert. denied, 499 U.S. 948, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991), ($15,000,000 wrongful death judgment remitted to $5,000,000); Intercontinental Life Ins. Co. v. Lindblom, 571 So.2d 1092 (Ala.1990), judgment vacated, 499 U.S. 956, 111 S.Ct. 1575, *913 113 L.Ed.2d 641 (1991), judgment reinstated on remand, 598 So.2d 886 (Ala.), cert. denied, ___ U.S. ___, 113 S.Ct. 200, 121 L.Ed.2d 142 (1992) ($3,012,400 judgment for bad faith, breach of contract, and fraud remitted to $1,000,000), and argues that such a remittitur is due here. The plaintiffs cite a number of cases in which the ratio of punitive damages to actual damages was much higher than the ratio in this case, in which the ratio of the punitive damages as remitted by the circuit court to the compensatory damages as remitted herein is only about 3.5 to 1,[5]e.g., TXO, supra (526:1, punitive to actual); Pacific Mutual Life Ins. Co. v. Haslip, supra (200:1, punitive to actual; 4:1, punitive to compensatory); Browning-Ferris Industries v. Kelco Disposal, Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (117:1, punitive to compensatory); Northwestern Mutual Life Ins. Co. v. Sheridan, 630 So.2d 384, 393-95 (Ala.1993) (1,036:1, punitive to actual; 31:1, punitive to compensatory); Union Mortgage Co. v. Barlow, 595 So.2d 1335 (Ala.), cert. denied, ___ U.S. ___, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992) (40:1, punitive to compensatory); HealthAmerica v. Menton, 551 So.2d 235 (Ala.1989), cert. denied, 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1069 (1990) (746:1, punitive to compensatory).
Having studied the cases cited, we conclude that the comparison to other cases is inconclusive. No case with such large actual damages has come to our attention. Because a party considering wrongful conduct may be more likely to take a risk when the stakes are larger, the only way to deter such parties from engaging in such conduct is to impose a commensurately high penalty when the wrongful conduct is discovered. Cf. TXO, supra, ___ U.S. at ___ - ___, 113 S.Ct. at 2721-22, in which the Court stated that the plaintiffs' actual damages of $19,000 were not as relevant as the fact that $1,000,000 or more in royalties was potentially at stake, in holding that the punitive award of $10,000,000 was not unconstitutionally excessive. Furthermore, the need for deterrence is heightened by the greater threat of harm to the plaintiff. Thus, the many cases with smaller actual or potential financial damages and consequently lower punitive damages do not provide helpful comparisons to this case.
Duck Head also argues that its conduct was not so culpable as to support the punitive damages award. On this question, the plaintiffs cross appeal from the circuit court's amendment of its Hammond order to delete the following two paragraphs strongly condemning Duck Head's conduct:
"Duck Head's conduct was reprehensible. Rather than paying the Plaintiffs what they had earned and were entitled to, the Defendant set about to implement a scheme, design and plan to steal almost $1,000,000 from the Plaintiffs. There is no question that Duck Head engaged in intentional, wrongful conduct. Numerous employees, as well as high-level management personnel, participated. The theft was so blatant that even outsiders, such as customers, knew of the scheme, as evidenced by confirmations they received. For Duck Head to think that it could explain away $24,000,000 in shipments is truly remarkable. The theft came in one of Duck Head's best years, where it had $130,000,000 in sales. Delta Woodside's net profit was almost $40,000,000 in that same fiscal year.
"Defendant was aware of the harm caused the Plaintiffs by its conduct. Plaintiffs claimed, and there was evidence, of Duck Head's concealment or cover-up in several instances."
The plaintiffs moved to strike Duck Head's motion to amend the Hammond order, arguing that there is no authority for such a motion. The circuit court denied the plaintiffs' motion to strike and granted Duck Head's motion. We find authority for Duck Head's motion in Rule 52(b), Ala.R.Civ.P. Rule 52 concerns "Findings by the Court," and Rule 52(b) provides, in pertinent part:
"Amendment. Upon motion of a party filed not later than 30 days after judgment *914 or entry of findings and conclusions the court may amend its findings or make additional findings or may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59."
The findings in the original Hammond order were first presented in that order, and Rule 52(b) is designed to permit a party to give a circuit court an opportunity to correct or amend its findings. We see no reason why this procedure should not apply to Hammond orders as well as to other orders entered in support of judgments, particularly because Hammond orders often change the amount of the judgment and may significantly affect appellate review. Thus, the court did not act beyond its authority in amending the order.
Even without the stronger language of the original order, however, the Hammond order makes it clear that the circuit court considered Duck Head's conduct to be reprehensible in the extreme. The jury obviously made such a finding also, as can be seen from the size of the punitive damages verdict. As set forth above and in much more detail in the record, the evidence supports inferences of systematic efforts by Duck Head to deprive these three of its sales representatives of nearly $1,000,000 in commissions.[6]
Upon review of a jury verdict, a reviewing court will view the evidence in the light most favorable to the party in whose favor the verdict was returned, drawing all reasonable inferences to that end that the evidence will sustain. King Motor Co. v. Wilson, 612 So.2d 1153 (Ala.1992). Furthermore, just as the presumption of correctness in favor of a verdict is strengthened when the circuit court denies a motion for new trial on the ground that the verdict is against the great weight and preponderance of the evidence, Kent v. Singleton, 457 So.2d 356, 359 (Ala.1984), the circuit court's refusal to remit the punitive damages any further, and its Hammond findings as to the reprehensibility of Duck Head's conduct, strengthen the presumption in favor of the verdict finding that Duck Head's activities were in fact highly deserving of punishment, not merely the result of accidents and mistakes as Duck Head contended. The jury and the circuit judge observed the demeanor of the witnesses during the trial, and even the cold record shows that Duck Head's officers and employees were often evasive and simply unable to answer the evidence of wrongdoing. Thus, a consideration of the culpability of the defendant's conduct supports a substantial punitive damages verdict.
Duck Head also argues that a consideration of its financial position supports a substantial reduction of the punitive damages. To this point we have been referring simply to "Duck Head," without differentiating among the corporate entities affected by the judgment, but a brief explanation is needed at this point. After Delta Woodside Industries bought all the stock of O'Brien Brothers, Inc., it dissolved that corporation and transferred its assets, including the Duck Head trademark, to Duck Head Apparel Company, Inc. Before the trial, Delta Woodside merged Duck Head Apparel Company, Inc., into another of its wholly owned subsidiaries, Alchem Capital Corporation. Delta Woodside maintains substantial direct control of each of its subsidiaries. It executed a guaranty of the judgment and does not argue that it should not be held liable apart from its subsidiaries' liability. Thus, the financial condition of Delta Woodside as a whole was *915 the subject of the Hammond hearing and will be discussed below.
The plaintiffs presented evidence at the Hammond hearing that Delta Woodside had made allowances for the verdict in its full original amount and that, even with the verdict at that amount, Delta Woodside's projections and plans did not significantly change. The plaintiffs presented testimony from Edward Sauls, a certified public accountant who had studied Delta Woodside's financial documents and other materials produced for the Hammond hearing. He testified:
"Q. All right, sir. What further actions did management take in response to this judgment?
"A. Well, management, as a part of its projections and forecast, put out capital budgets that were very similar to budgets that were prepared before the award, indicating that their plans for the capital budgets were going to go along pretty much as scheduled. They continued to pay dividends at the same rate as they did prior to the award. You know, I've seen nothing in any of the documents that indicates that the company plans to cut back in respect to operations, payroll, or retirement benefits. Nothing that was put into the public stream of information indicated any of that."
Nevertheless, Delta Woodside now raises the specter of drastic effects from the verdict on its ability to invest in capital equipment to maintain its competitive position or on its ability to maintain its payroll or retirement plans and other benefits for its employees.
This catalogue of catastrophic effects is made suspect by the public documents and other documents reviewed by Mr. Sauls. Delta Woodside recorded a litigation reserve of $33,000,000 on its financial statements for 1994, after this verdict was returned in November 1993. However, at the same time, it recorded "restructuring reserves" and "special charges" totalling more than $18,000,000. These were unusual, even unique, in the history of Delta Woodside. Delta Woodside requested at the Hammond hearing, and the plaintiffs agreed, that the details of these reserves be kept confidential, although some components of the reserves, such as its intent to sell Harper Brothers, one of its wholly owned companies, were made public before the Hammond hearing. The plaintiffs' attorney asked Bettis Rainsford, the executive vice president, chief financial officer, and treasurer of Delta Woodside, the following question: "There is nothing compelling about any of these entries that require[s] it to be put into the same quarter as the judgment?" Rainsford answered, "That's correct." Thus, to the extent that Delta Woodside's financial prospects do appear significantly harmed in conjunction with this judgment, the circuit court could have found that Delta Woodside deliberately enhanced such an appearance by "piggy-backing" unusual but not urgent reserves onto the litigation reserve.
In short, the financial condition of Delta Woodside does not unambiguously point to a conclusion that the verdict is excessive. Although the amount is significant in relation to Delta Woodside's assets and even in relation to its projected income, it is not so significant as to compel a further reduction of the verdict. Moreover, there is at least some likelihood that Delta Woodside will win its action against its insurance carrier; its coverage is more than the amount of the verdict in this case.
Although the plaintiffs insist that the original amount of punitive damages should be reinstated, we do not conclude that the circuit court's action in ordering a $4,500,000 remittitur is due to be reversed. The circuit court observed the entire proceedings, and we decline to reinstate the full jury award.
The final issue stems from the cross appeal. Because certain allegedly confidential documents had been introduced at the Hammond hearing, the circuit court entered a protective order. However, its order is broadly worded, and the plaintiffs argue that it had the effect of sealing the entire record. This position is supported by a letter from the circuit clerk, who reads the order as sealing the entire record. The plaintiffs argue that the protective order should be reversed to the extent that it orders any sealing of the record beyond the strict requirements of the limited number of truly confidential exhibits.
*916 There is a strong public policy favoring public access to court records. Holland v. Eads, 614 So.2d 1012 (Ala.1993).
"Limitations of the public's right to inspect `must be strictly construed and must be applied only in those cases where it is readily apparent that disclosure will result in undue harm or embarrassment to an individual, or where the public interest will clearly be adversely affected, when weighed against the public policy considerations suggesting disclosure.' Chambers v. Birmingham News Co., 552 So.2d 854, 856 (Ala.1989). The party refusing disclosure bears the burden of `proving that the writings or records sought are within an exception and warrant nondisclosure of them.' Chambers, at 856-57 [other citations omitted]."
Id., at 1015.
During the pendency of this appeal, the parties have filed motions and responses, and have made arguments in their briefs, regarding which of the Hammond exhibits are properly confidential and subject to a protective order and which portions of the Hammond transcript are due to be sealed because of testimony pertaining to those exhibits. The circuit court's order is certainly overbroad to the extent that it implies that any of the trial transcript or exhibits, the clerk's record, or the Hammond transcript and exhibits not contended to be confidential are due to be sealed. Moreover, several of the exhibits and much of the testimony that Duck Head claims is confidential do not appear confidential. Most important, some of this evidence is crucial to the plaintiffs' rebuttal of Duck Head's arguments that the verdict or even the judgment as remitted will punish Duck Head too severely.
Most of the allegedly confidential information pertains to financial projections by Delta Woodside for its operations through 1998. Although there may be legitimate reasons that Delta Woodside needs to keep some of the details of this information confidential, the general figures are not so highly sensitive as to overcome the policy of public access to judicial records. In particular, the testimony of the plaintiffs' expert witness, Edward Sauls, is crucial to the plaintiffs' attempts to show that the verdict is not too large in relation to Delta Woodside's financial condition. Although Sauls's testimony recites figures from some of the exhibits designated by Duck Head as confidential, we have reviewed his testimony that Duck Head considers subject to a protective order, and we note that Sauls states only the general figures in Delta Woodside's financial projections, not the details that are more properly subject to protection as confidential. Thus, Duck Head's attempt to designate portions of Sauls's testimony as confidential will be disallowed.
Certain exhibits were designated as confidential. Because most of these exhibits contain details that can legitimately be viewed as confidential, we will not overturn the protective order insofar as it designates the exhibits as confidential. Some of the exhibits are reproduced or summarized in the appendix to the plaintiffs' brief, and Duck Head has filed a motion with this Court to designate those as confidential. Again, we decline to hold as confidential the exhibits that simply give general figures or summaries. However, the following appendix documents give details of Delta Woodside's operations and will be placed under seal: 21, 23, 24, and 33. We do note that appendix number 33 shows a breakdown of Duck Head's sales by state for 1991 and 1992 and that the sales in Alabama and Georgia were more than a third of the total shown for both years. We decline to accept Duck Head's designation of appendix documents 16, 17, 20, and 22 as confidential. Appendix 16 is a description of similar actions against Duck Head and so is important in respect to several Hammond/Green Oil factors. Appendix 17 contains only general projections of Duck Head's financial condition and is necessary to rebut Duck Head's argument that the verdict will have too great an impact. Appendix 20 is an income statement and so could contain confidential information, but it shows the unusual nature of the "restructuring reserve" and the "special charges" and so is highly probative of several aspects of the plaintiffs' contentions that the judgment is not too high. Appendix 22 shows that Delta Woodside's projections of capital expenditures did not change significantly *917 from August 1993, before the verdict, to February 1994, after the verdict; in fact the February projections are higher for 1995, 1997, and 1998. We note that the February figures were stated by Mr. Sauls at page 1761 of the transcript, lines 3 through 9, and that Duck Head did not designate this excerpt of the transcript as confidential.
Duck Head's motion also seeks to designate portions of the appellees' brief as confidential. We have reviewed those excerpts and found them to pertain to the general figures and to the highly probative material in appendices 17, 20, and 22. The motion is therefore denied as to the appellees' brief.
Other than the testimony of Mr. Sauls, Duck Head's designations of confidentiality of the transcript are accepted, and those portions of the transcript will be placed under seal.
For the reasons stated, the judgment is affirmed, conditioned upon an acceptance of a remittitur by Ken Hoots of $2,000,000 of the mental anguish damages awarded to him; a remittitur by Terry Long of $1,000,000 of the mental anguish damages awarded to him; and a remittitur by Bill Pace of $500,000 of the mental anguish damages awarded to him. The protective order is modified as stated above.
AFFIRMED CONDITIONALLY; PROTECTIVE ORDER MODIFIED.
SHORES, KENNEDY, INGRAM, COOK and BUTTS,[*] JJ., concur.
MADDOX and HOUSTON, JJ., dissent.
HORNSBY, C.J., recused.
HOUSTON, Justice (dissenting).
Punitive damages are awarded solely for the purpose of vindicating and protecting society's interests by punishing those who engage in egregious tortious conduct and by deterring them and others from engaging in such conduct in the future. Only an amount necessary to accomplish these societal goals may be awarded. Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
"A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." Honda Motor Co., Ltd. v. Oberg, ___ U.S. ___, ___, 114 S.Ct. 2331, 2342, 129 L.Ed.2d 336 (1994). "`"[P]rocedural due process" requires judicial review of punitive damages awards for reasonableness....'" Id., ___ U.S. at ___, 114 S.Ct. at 2335, quoting Justice Scalia's opinion concurring in the judgment in TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).
Whose function is it to determine what a reasonable punishment should be for egregious tortious conduct? In a case in which punitive damages are permitted, "`[o]nce a jury is demanded by either party, the jury has the [initial] constitutional authority to determine what amount, if any, of punitive damages is necessary to punish a defendant for wrongful conduct and to deter future conduct of a like nature.'" Henderson v. Alabama Power Co., 627 So.2d 878, 887 (Ala. 1993), quoting Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878, 884 (Ala.1991). However, the jury is not the final arbiter of the "reasonableness" of a punitive damages award. Both the trial court and this Court may be called upon to determine the reasonableness of a punitive damages award. See Green Oil Co. v. Hornsby, supra, and its progeny. This procedure for judicial review of a punitive damages award is necessitated by the fact that it is a violation of a civil defendant's right to procedural due process to permit a jury alone to determine the reasonableness of an award of punitive damages. The procedural due process guarantee of the Fourteenth Amendment to the United States Constitution requires "meaningful" judicial review of a punitive damages award for reasonableness. Honda Motor Co., Ltd. v. Oberg, supra; Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 20, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991) (discussing "meaningful and adequate" judicial review).
Is it the function of the courts, then, to ultimately determine the reasonableness of a *918 punitive damages award? A majority of this Court thinks so:
"Whether Meighan [v. Birmingham Terminal Co., 165 Ala. 591, 51 So. 775 (1910),] was rightly or wrongly decided on this point, it should not be taken as meaning that the Legislature can violate or diminish the jury's historic, constitutionally preserved function of punishing egregiously wrongful conduct by the imposition of punitive damages in civil actions. Such damages have long been imposed by the jury according to its sound discretion and according to its findings as to the degree of the wrong and the amount of damages necessary and appropriate as punishment. Thus, a limitation on punitive damages such as that imposed by § 6-11-21[, Ala. Code 1975,] clearly impairs the traditional function of the jury.
"In performing this function, the jury is an institution of the body politic. In a jury, citizens exercise direct democracy, whereas the legislature consists of representatives of the people, exercising the people's power and doing their will only indirectly. The jury serves as the conscience of the community. It acts in particular cases, whereas the legislature makes rules for general classes of situations. Legislation cannot take into account the particular circumstances of a particular wrong.
"This Court, in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), articulated, clarified, and refined the common law mechanism of remittitur, so as to protect defendants on a case by case basis from verdicts so excessive or out of proportion to the wrong or to the individual defendant as to violate the defendant's right not to be deprived of property without due process of law. A legislative act that is not so particularized is a grave imposition on the discretion that has always been given to juries.
"Such a limitation could properly be imposed by constitutional amendment, in which the people exercise direct democracy, just as they do when they serve on juries. If the people, as amenders of their constitution, wish to limit their power as jurors, they can do so. Section 11 of the Constitution reserves this power of the people out of the powers granted to the legislature."
Henderson v. Alabama Power Co., supra, at 893. (Emphasis in original.)
This dissent is not directed toward the function of the jury or toward the clash between two concepts as ancient as Magna Charta, both of which were enshrined in the Constitution of Alabama of 1901â representative democracy and the right to trial by jury.[7] This dissent addresses only the judicial review of punitive damages for reasonableness, which is a requirement of procedural due process under the Fourteenth Amendment. Honda, ___ U.S. at ___, 114 S.Ct. at 2335.
Who sets the outer limit of reasonableness of a punitive damages award? It cannot be the jury,[8] or there would be no procedural due process requirement of judicial review of those damages for reasonableness. Does the trial court[9] or the appellate court do so in each individual case? If so, who whispers in the court's ear what amount exceeds a reasonable punishment in each particular case? Is the outer limit of reasonableness determined by a comparison of various punitive *919 damages awards, which have been judicially approved, in factually similar cases? Possibly so. In BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994), cert. granted, ___ U.S. ___, 115 S.Ct. 932, 130 L.Ed.2d 879 (1995),[10] which involved evidence of a pattern and practice of fraudulent or wrongful sales of automobiles, this Court reduced a punitive damages award from $4,000,000 to $2,000,000. I concurred specially in that case, for there were 14 incidents of sales that were fraudulent or wrongful in Alabama. At that time, another case involving similar allegations of fraud against BMW had been tried and no punitive damages were awarded. See Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App.1993), cert. quashed, 642 So.2d 937 (Ala.1993). Still, by multiplying 13 Ũ $162,637, the maximum punitive damages award, adjusted for inflation, that had been affirmed in a similar case (Mobile Dodge, Inc. v. Alford, 487 So.2d 866 (Ala. 1986), appeal dismissed, 486 U.S. 1028, 108 S.Ct. 2008, 100 L.Ed.2d 596 (1988)), I arrived at a figure in excess of $2,000,000; therefore, I concurred specially.
"In remitting a punitive damages award, we must remit only that amount in excess of the maximum amount that a properly functioning jury could have awarded." Big B, Inc. v. Cottingham, 634 So.2d 999, 1006 (Ala. 1993). The Alabama Legislature has not set a maximum punitive damages limit in cases involving "[a] pattern or practice of intentional wrongful conduct." Ala.Code 1975, § 6-11-21(1); in such cases, the judiciary must set the outer limits of reasonableness.
This case does not involve "a pattern or practice of intentional wrongful conduct"[11] or any of the other exceptions listed in § 6-11-21; therefore, there is the legislative pronouncement that "an award of punitive damages shall not exceed $250,000." See § 6-11-21. When the legislature has set a maximum punitive damages award that may be imposed upon a defendant in a case, can the judiciary, in reviewing punitive damages for reasonableness in accordance with the due process requirement of the Fourteenth Amendment, ignore that legislation?[12] It is the basic function of the legislature to establish this state's public policy. See Almon v. Morgan County, 245 Ala. 241, 16 So.2d 511 (1944) ("the Legislature prescribes the State's policy; the courts do not"); and Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944), cert. dismissed, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945), wherein this Court stated:
"Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom."
(Citations omitted.)
Historically the power to punish for criminal behavior in this country has rested in legislative bodies elected by the people.
"The power to prescribe the penalty to be imposed for [the] commission of a crime rests with the legislature, not with the *920 courts. This power is not a special grant or limited authority; it is part of the sovereign power of the state to maintain social order and to take life and liberty and the rights of both when necessary. As the Supreme Court has stated, whatever views may be entertained regarding the severity of punishment, whether one believes in its efficacy or its futility, these are peculiarly questions of legislative policy.
"The power of a legislative body with respect to punishment for crime is practically unlimited, and is controlled only by constitutional provisions. Subject to this qualification, the legislature may fix the punishment for crime as it sees fit, and where a particular punishment is prescribed, no other may be imposed."
21 Am.Jur.2d Criminal Law § 589 (1981). See, also, Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); Jones v. Thomas, 491 U.S. 376, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989). In Alabama, the legislature sets the punishment for criminal offenses. See Ala.Code 1975, §§ 13A-5-6, 13A-5-7, 13A-5-9, 13A-5-11, 13A-5-12, 13A-5-13, and 13A-5-39 et seq; see, also, Ex parte Giles, 632 So.2d 577 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). In fulfilling this function, in accordance with Article I, § 35, of the Alabama Constitution, the legislature determines the extent to which the state can be allowed to deprive a person convicted of a criminal offense of his property, including a person convicted of the most egregious criminal act. By way of example, a person convicted of a class A felony, such as murder under § 13A-6-2, may be fined an amount not exceeding $20,000, or "[a]ny amount not exceeding double the pecuniary gain to the defendant or loss to the victim caused by the commission of the offense." Section 13A-5-11(a)(1) and (a)(4). If a trial court were to impose a fine in excess of that prescribed in these sections of the Code, would this not be a violation of due process under the Fourteenth Amendment? If an appellate court should affirm such a sentence, would that not be a violation of due process under the Fourteenth Amendment?
"A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." Honda, ___ U.S. at ___, 114 S.Ct. at 2342. In fulfilling its policy-making role on the civil side of the law, the legislature has determined that $250,000 is the maximum "reasonable" amount of punitive damages that should be awarded in fraud cases, such as the present one, where no pattern or practice of wrongful conduct has been shown. § 6-11-21. A majority of this Court in Henderson, supra, held that § 6-11-21 was unconstitutional under Article I, § 11, of the Alabama Constitution, to the extent that it set a limit on the amount of punitive damages that could be awarded by a jury in a particular case. In cases where the trial court acts as the factfinder, however, punitive damages cannot exceed $250,000, unless the punitive damages award is based on one of the three exceptions listed in § 6-11-21, because clearly what the trial court does as a factfinder is in no way affected by § 11 of the Alabama Constitution. Thus the $250,000 statutory limit is no less a viable expression of this state's public policy following Henderson. This Court, exercising supervisory appellate jurisdiction over jury verdicts, is bound by the Fourteenth Amendment and Article VI (the Supremacy Clause) of the United States Constitution to conduct a "meaningful" review of jury verdicts awarding punitive damages. This Court simply cannot fulfill this constitutionally mandated function without recognizing that the legislature, acting within its policy-making power, has determined that $250,000 is the maximum reasonable amount of punitive damages that should be awarded in fraud cases like this one.[13]
From my perspective as an Associate Justice of the Supreme Court of Alabama, and after struggling many years to bring some *921 "rhyme or reason" to the process by which punitive damages awards are to be reviewed on appeal, I have concluded that it is a violation of the Fourteenth Amendment for this Court, in attempting to fulfill its constitutionally mandated responsibility of conducting a meaningful review of punitive damages awards, to ignore the public policy of this state, as expressed in § 6-11-21, and to affirm an award of punitive damages in excess of $250,000, when none of the exceptions listed in § 6-11-21 apply. Justice Hugo Black, writing for a majority of the Court in Giaccio v. Pennsylvania, 382 U.S. 399, 403, 86 S.Ct. 518, 521, 15 L.Ed.2d 447 (1966), noted that "one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land." In my view, the majority's decision here is no less objectionable under the Fourteenth Amendment than would be a decision from this Court, or from the Court of Criminal Appeals, upholding punishment in a criminal case in excess of the legislatively prescribed punishment for the offense charged. See Hicks v. Oklahoma, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).
Time and again this Court has held that a plaintiff has no right to punitive damages. See, e.g., Meighan v. Birmingham Terminal Co., 165 Ala. 591, 51 So. 775 (1910); Comer v. Age-Herald Publishing Co., 151 Ala. 613, 44 So. 673 (1907). Therefore, in addressing punitive damages "the sole object and only legitimate end of [both the legislative and judicial departments of] government is to protect" the property interests of civil defendants in cases where punitive damages are sought; and when the judicial department ignores legislative policy with respect to the outer limit of punitive damages that can be awarded in tort cases, it has exceeded the "sole object and only legitimate end of government," and, in accordance with Article I, § 35, of the Constitution, it has engaged in "usurpation and oppression."
For the foregoing reasons, I respectfully dissent from that portion of the majority opinion affirming the trial court's remittitur of the jury's award of punitive damages from $19,500,000 to $15,000,000. I would remit the punitive damages award to $250,000, in accordance with the established policy of this state. However, I would remand to allow the plaintiffs to accept the $2,556,353.60 (three times the compensatory damages for breach of contract, pursuant to Ala.Code 1975, § 8-24-1 et seq.), in lieu of the $250,000 punitive damages.
MADDOX, J., concurs.

On Application for Rehearing
ALMON, Justice.
APPLICATION OVERRULED.
SHORES, KENNEDY, INGRAM, COOK and BUTTS, JJ., concur.
MADDOX and HOUSTON, JJ., dissent.
HORNSBY, C.J., recused.
HOUSTON, Justice (dissenting).
Footnote six to the majority opinion was added after my dissent was written. Hoots, Long, and Pace ("plaintiffs"), in their "Brief in Response to Application for Rehearing," contend that this is a case involving a "pattern and practice of intentional wrongful conduct."
The defendants, Duck Head and Delta Woodside, wrote on page 75 of their original brief:
"Duck Head's alleged misconduct was plainly limited in scope and duration, and involved at most six former sales persons, the three plaintiffs here and three others.... There was no evidence of any pattern or practice of misconduct, or any long-term policy of fraud or misrepresentation, as as there was in, e.g., Northwestern Mutual, 630 So.2d 384, and BMW [of North America, Inc. v. Gore, supra]."
In footnote 39, on page 69 of their initial brief, the plaintiffs wrote:
"Duck Head and Delta Woodside have been successful in forcing distress settlements in the other claims filed against them. These other cases exhibit a pattern and practice of deceitful conduct, for which the companies have yet to be punished."
*922 (Emphasis added.) I interpreted this sentence in footnote 39 to mean that the punitive damages awarded in this present case did not punish the defendants for the "pattern and practice of deceitful conduct" referred to in that footnote. I assume from footnote 6 to the majority opinion, and from the plaintiffs' response to the application for rehearing, that this is a "pattern and practice" case.[1]
The jury found that the defendants' actions were reprehensible, and there was evidence to support that finding. In Northwestern Mutual Life Insurance Co. v. Sheridan, 630 So.2d 384 (Ala.1993), this Court unanimously reduced a punitive damages award from $24,727,248 to $12,863,624. To me, the actions of Northwestern Mutual were much more reprehensible than the actions of the defendants in this case. In Northwestern Mutual, we wrote:
"[P]laintiffs alleged and proved at trial that Northwestern Mutual played an active role in allowing Behr to defraud plaintiffs and at least fifty [50] additional Northwestern Mutual policy owners."
630 So.2d at 393; see also statements at 394.
I concurred in awarding $12,863,624 in Northwestern Mutual because that was a "pattern and practice" case that involved wrong done to the two plaintiffs in that case and to at least 50 additional Northwestern Mutual policy owners. The punitive damages award approved by this Court amounted to slightly less than $250,000 (specifically, $247,377) for each act involved in the "pattern and practice." I thought that complied with the $250,000 statutory limit that I find is a viable expression of this State's public policy, as expressed in my original dissent. The legislature did not set a limit on punitive damages when there is a "pattern and practice of intentional wrongful conduct"; however, it appears to me that it would be logical in setting the outer limit of the reasonableness of a punitive damages award in a pattern and practice case to multiply $250,000 times the number of wrongful acts that make up the "pattern and practice of intentional wrongful conduct." That was my rationale for concurring in Northwestern Mutual. Applying that rationale to this case, I would multiply $250,000 times 6 (the maximum number of acts that could be involved if this is a "pattern and practice" case); and I would remit the punitive damages award to $1,500,000 (250,000 Ũ 6).
MADDOX, J., concurs.
NOTES
[1] Actually, the president of Delta Woodside, Erwin Maddrey, was the president of Duck Head Apparel Company, Inc., but Stanton was designated the president of Duck Head as an "operating division."
[2] The only compensatory damages claims submitted to the jury under the fraud count were for mental anguish, because Duck Head argued that any other compensatory damages for fraud would duplicate the compensatory damages for breach of contract.
[3] Duck Head retained new counsel for the Hammond hearing and this appeal.
[4] This paragraph was substituted for two paragraphs in the order as initially issued. In their cross appeal, the plaintiffs challenge the authority of the court to issue the amended order.
[5] The ratio of the $19,500,000 punitive damages verdict to the $852,000 award of actual damages was about 23:1; to the $7,852,000 award of compensatory damages, only about 2.5:1. The ratio of the $15,000,000 punitive damages judgment to the actual damages is about 17.6:1; to the compensatory damages awarded by the jury, less than 2:1; and to the compensatory damages as remitted by this opinion, about 3.5:1.
[6] The dissent states that "This case does not involve `a pattern or practice of intentional wrongful conduct' or any of the other exceptions listed in § 6-11-21." Section 6-11-21 provided that a plaintiff could recover more than $250,000 in punitive damages by showing a "pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff." The plaintiffs here had no cause to attempt to show a "pattern or practice of intentional wrongful conduct" as such, because this Court had held § 6-11-21 unconstitutional in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993). Nevertheless, this case seems to be a perfect example of what would constitute a "pattern or practice" under that statute: over a period of time, five or six months or longer, Duck Head engaged in a series of intentional wrongful acts designed to defraud its salesmen of their earned commissions. Thus, the action pertains to a concerted, coordinated series of "hundreds" of acts affecting a number of different individuals. What more could a pattern or practice be?
[*] Although Justice Butts was not a member of this Court when this case was orally argued, he has studied the record and the briefs and has listened to the tapes of oral argument.
[7] I note that I do not accept the misguided theory espoused by the majority in Henderson that the role of representative democracy (the process whereby the people's power and will are exercised by their elected representatives in the form of a body politic known as a legislature) is somehow subservient to the role of the jury in determining the reasonableness of civil punishment.
[8] The jury returned a verdict in this case on November 24, 1993, at the conclusion of a 7-day trial. Evidence introduced at the Hammond hearing in this case indicated that the median jury award for punitive damages in non-wrongful death cases for the 1992-93 Court Term, which ended less than two months before this jury verdict, was $30,000. The average punitive damages award for jury and bench trials in 1992-93 was $159,000.
[9] Evidence introduced at the Hammond hearing in this case indicated that the median bench trial award for punitive damages in non-wrongful death cases for the 1992-93 Court Term was $25,000.
[10] The Supreme Court of the United States has granted certiorari review in this case.
[11] See the brief of Duck Head Apparel Company, Inc., at 75. See, also, Ken Hoots, Terry Long, and Bill Pace's brief at 69, n. 39.
[12] In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 19-20, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991), the United States Supreme Court, in discussing the discretion allowed under Alabama law in determining punitive damages, noted: "The Alabama Legislature recently enacted a statute that places a $250,000 limit on punitive damages in most cases. See 1987 Ala. Acts, No. 87-185, §§ 1, 2, and 4. The legislation, however, became effective only on June 11, 1987, see § 12, after the cause of action in [Pacific Mutual v. Haslip] arose and the complaint was filed."
[13] I am aware of no decision from this Court holding that the expression of policy set out by the legislature in § 6-11-21 violates the separation of powers provision of the Constitution of Alabama of 1901, Article III, § 43. By mentioning this, I am not suggesting that § 6-11-21 in any way violates Article III, § 43, of the Constitution.
[1] I have concern about this. The three sales representatives who were not plaintiffs in this action had sued these defendants, and two of those sales representatives had settled their cases before the trial of this case. One case was still pending at the time of the trial of this case. Can a plaintiff use the conduct of the defendants toward others when this conduct has been the subject of actions that have been concluded between the defendants and those third parties, to civilly punish the defendants? I assume, without deciding, and for the purposes of this dissent only, that this can be done.